(Hamilton County Court of Common Pleas.)

EVAN J. HENRY v. THE PITTSBURGH, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY COMPANY, and THE CINCINNATI & MUSKINGUM VALLEY RAILWAY COMPANY.

---

1. A stockholder in a railway company may sue on behalf of the stockholders to enforce rights when the corporation refuses to sue, and the fact that he may be otherwise interested is immaterial.
2. A decree in a suit brought by the trustee of a mortgage for the foreclosure of that mortgage, does not estop the same person suing as a stockholder.
3. The agreement in the lease from the Cincinnati & Muskingum Valley Railway Company to the Pittsburgh, Cincinnati & St. Louis Railway Company, whereby the latter company agreed to advance the money necessary to pay the coupons on the bonds of the former; such advance to be paid out of subsequent earnings and not otherwise, held to be not harsh, oppressive or inequitable, and not to be an agreement to loan money to an insolvent corporation, which the court will not enforce.
4. Such agreement held not to be conditional upon the furnishing of funds to make certain betterments.
5. The lease of a railroad cannot be rescinded except by the same consent of stockholders required to authorize a lease.
6. The court refused to compel the lessee of a railroad to specifically perform a covenant requiring it to operate the leased line.

---

## STATEMENT OF CASE.

The railroad from Zanesville to Morrow was constructed by the Cincinnati, Wilmington & Zanesville Railroad Company, organized in 1851.

In 1852 the company issued its bonds to the amount of $1,300,000.00. bearing seven per cent. interest, and secured the same by its mortgage upon the railroad and all its property and franchises.   The company made default in payment of interest on the bonds, and in 1857 suit was brought in the United States Circuit Court for the Southern District of Ohio, to foreclose the mortgage, in which case a decree was taken, and the mortgaged railroad, property and franchises were sold under the decree in 1863, at public auction, for $600,000.00, to Charles Moran, who purchased in trust for such creditors and stockholders as should unite in an agreement for reorganization.

Thereupon said parties re-organized the company under the name of The Cincinnati & Zanesville Railroad Company, and this company issued its bonds to the amount of $1,300,000,00 bearing seven per cent. interest, to the holders of the mortgage bonds of the original company, and secured them by a mortgage on all its road, etc.

This company in turn made default in payment of interest on said bonds, and in 1869 suit was brought in said Circuit Court to foreclose said mortgage, and a decree being taken, the mortgaged property was·sold to Thomas L. Jewett for $1,004,000.00, the property to be conveyed to such parties as Jewett should direct.

In 1870 the holders of said bonds reorganized the company under the present name of The Cincinnati & Muskingum Valley Railroad Company (and hereinafter for convenience called the Muskingum Valley Co.), and by direction of Jewett the said railroad property and franchises were conveyed to said company.

Thereupon the said Muskingum Valley Co. made its bonds to the amount of $1,500,000.00, being 1,500 bonds of $1,000 each, and payable in thirty years from January 1, 1871, and secured the same by its mortgage to Charles Moran and J. Edgar Thompson, trustees, and issued 1,300 of said bonds to the holders of said bonds of said Cincinnati & Zanesville Railroad Co.

The Pennsylvania Railroad Co. became the owners of 754 of said bonds, and Moran Brothers became the owners of more than 400, and E. J. Henry received ten bonds. The fifteen hundred (1500) bonds so made contained a provision that the stockholders of the Muskingum Valley Co. should not be personally liable for any portion of the principal or interest thereof, and which provision was recited in the mortgage. The bonds bore interest at the rate of seven per cent. per annum, payable semi-annually, according to interest warrants or coupons thereto attached.

The Muskingum Valley Company issued 71,473 shares of capital stock, of which 550 shares were distributed to E. J. Henry; 26,555 to Charles Moran; and 44,368 to the Pennsylvania Railroad Co.

In addition to these shares, 8,527 shares were subscribed for by sundry persons, and the proceeds applieds in the extension of the road to Dresden Junction, and of which 8,527 shares Moran Brothers took 2,188, and the Pittsburgh, Cincinnati & St. Louis Ry. Co. (and hereinafter for convenience called the Pan Handle Co.) took 4,250 shares. Some shares subscribed for were not taken, and the total outstanding stock of the Muskingum Valley Co. was 79,946 shares. The 44,368 shares belonging to the Pennsylvania R. R. Co., and the 4,250 belonging to the Pan Handle Co., were afterwards, in 1872, transferred to the Pennsylvania Co.; so that the company held 48,618 shares of the total 79,946 shares outstanding.

The Muskingum Valley Co. extended the road from Zanesville to Dresden Junction, and applied the proceed of certain stock subscriptions, and the proceeds of 200 of these mortgage bonds (less a balance of $1,200.00), in paying the expenses of such extension. The mortgage executed to secure said bonds included this extension of the road. That is, the mortgage covered the road, etc., from Dresden to Morrow, a distance of 148 mlies.

After this extension was made the road of the Muskingum Valley Co. came in conjunction with the Pan Handle Co. at Dresden and at Morrow, so that the lines of the rails of the Muskingum Valley Co. were brought into connection with the rails of the an Handle Co. at these two points.

The line of road of the Pan Handle Co. extended from Pittsburgh through Dresden to Columbus, and from Columbus through Morrow to Cincinnati, and from Columbus to Indianapolis and Chicago. The Muskingum Valley Co. operated its road down to May, 1873.

As stated, the road had been twice sold under foreclosure on failure of the company to pay interest on its bonds. After the reorganization of the company in 1870 and the extension of the road from Zanesville to Dresden Junction, there seemed to be an improvement in its business. The third vice-president of the Pan Handle Co. wrote to Mr. Moran on September

18, 1871, that he was informed by the president of the Muskingum Valley Co., that the net earnings of the line were then amply sufficient to meet the interest on the mortgage debt. A statement issued by H. J. Jewett, president of the Muskingum Valley Co. in October, 1871, was to the effect that the earnings of the road since it belonged to its then owners had been sufficient to meet the interest on the bonds due to the part of the road in use, and Mr. Thompson, a trustee under the mortgage, stated that the earnings were sufficient to meet the interest. In a letter written by Mr. Jewett, on November 15, 1872, he says:

"The business of the road is on a continual increase. * * * With the present equipment the road can earn enough to maintain itself and pay the interest upon its present debt, with some surplus. But with an equipment equal to its necessities, it can increase its earnings largely, without any corresponding increase of expense. * * * The property is a valuable one and needs only proper handling and management to develop satisfactory and profitable results."

In a letter written by Mr. Churchill and Mr. Fillmore, two of the directors of the Muskingum Valley Co., to Mr. Moran, on December 10, 1872, they call attention to the fact that the road had demonstrated that it could earn enough to pay the interest on its bonds.

For the fiscal year ending March 31, 1872, the road was operated at a net profit of over $41,000.00—the interest on the bonds being included as an expense. The report of the directors for this year is to the effect that the business on the line of the road was improving, and that by giving to it all reasonable facilities, the stockholders might safely calculate on a large increase of traffic and passage travel. The net earnings in the year 1873, however, were not sufficient to pay the interest on the bonds.

Mr. Becker, an engineer familiar with the line, says that from the time of the reorganization of the road in 1869 to 1873 there was no other road lying either parallel with it or intersecting it, so that there was during that time no competition to its local traffic; but that since that time quite a number of new roads have been constructed which lie parallel to it or intersect it and compete with it for business.

The Pennsylvania Company and the Pennsylvania Railroad Company are corporations under the laws of Pennsylvania. The Pennsylvania Railroad Company owns a large majority (being the entire stock, excepting not exceeding $5,000, outstanding for the purpose of qualifying directors) of the Pennsylvania Company.

In the years 1872 and 1873 and until the year 1890, the capital stock of the Pan Handle Co. consisted of about 168,671 shares of $50 each, of which amount the Pennsylvania Railroad Company held 60,000 shares, and the Pennsylvania Company held 75,576 shares.

In 1872 and 1873 and during the following years, the capital stock of the Muskingum Valley Co. amounted to about 79,932 shares of $50 each, and of which the Pennsylvania Company owned and held 48,618 shares.

In the years 1872 and 1873 there were seven directors of the Muskingum Valley Co., viz: Charles Moran, George B. Roberts, Thomas A. Scott, E. E. Fillmore, H. J. Jewett, M. Churchill and G. W. Adams. H. J. Jewett was the president. Of these directors, George B. Roberts, Thomas A. Scott and G. W. Adams were also directors of the Pan Handle Co.; Thomas A. Scott being the president of the Pan Handle Company, and, as stated in argument, of the Pennsylvania Railroad Co. H. J. Jewett was also the general counsel of the Pan Handle Co., and a director and general counsel of the Pennsylvania Company.

On September 12, 1871, Edmund Smith, the third vice-president of the Pennsylvania Railroad Co., wrote to Mr. Moran saying they had $807,-

000 of the first mortgage bonds of the Muskingum Valley Co., asking if he could name a price for them. Mr. Moran answered on September 13, 1871, to the effect that the bonds could easily be placed were it not that the past embarrassments of the companies which had owned the road had thrown discredit on the enterprise, which nothing could remove except several years' revenue sufficient to meet all expenditures and a surplus beyond the interest. "If, however, your company can and will legally guarantee the payment of the principal and interest of these bonds, I think it very possible that we could dispose of them at a fair price through our friends in Europe. This guarantee seems to us especially proper and safe for your company, because by its control of the western and eastern traffic it can either direct to or divert from the C. & M. V. Ry. whatever portion of that traffic your company may deem proper, and thus secure earnings amply sufficient, not only to make the bonds, but even the shares, of the C. & M. V. Ry. Co. undoubted investments, having a satisfactory current market value."

To this Mr. Smith wrote an answer, of date September 18, 1871, in which he says: "I am informed by the president of that (the Muskingum Valley) company, that the net earnings of the line are now amply sufficient to meet the interest upon its mortgage debt. They will no doubt be largely increased upon the opening of the line from Zanesville to Dresden," and that the Pennsylvania Railroad Company was not prepared to make the endorsement on the bonds suggested, but preferred they should rest on their own merits.

In May, 1872, a proposed lease of the Muskingum Valley Road to the Pan Handle Co. was submitted to Mr. Moran, representing the minority stockholders and bondholders of the Muskingum Valley Co., and he refused assent to it, saying in a letter written on May 8, to Mr. Scott, president of the Pan Handle Co.: "After perusing the proposed lease of the C. & M. V. Ry. Co., I find it a mere conveyance of the road for a period of 99 years, without one single stipulation in favor of the C. & M. V. Co. or the stockholders * * * any just, proper, equitable lease I will gladly assent to."

This seems to have been the first Mr. Moran knew of the proposed lease, as he wrote Mr. Scott, on the next day: "I wrote you yesterday a few hurried lines in regard to the contemplated lease of the 'C. & M. V. Road, a scheme which took me entirely by surprise, as I never supposed anything of the kind could be prepared for execution without a word on the subject being said to me, both as a director of the company and as representative of the large interest which Moran Brothers and their friends have in the company."

He states how he and his friends had joined in the purchase of the C. W. & Z. Road, and says: "Now, under such circumstances, do you think these interests should be sacrificed to the interest of your company? Is this all necessary to the attainment of the object you have in view, and for which you make the lease? If the sacrifice of the C. & M. V. be necessary, at least the interest of Moran Bros. and their friends, who in good faith joined you as co-partners and co-operated with you in all your views, should be protected."

Mr. Scott, on May 9, answers the letter of May 8, and says that their sole purpose was to get the property into a shape where it could be worked on the most economical basis possible, and be entirely within the control of its owners as to revenue; that the lease is made to cover every dollar of revenue received from its business, beyond the actual current expenses; so that bondholders and stockholders must realize everything that can be made out of it. In doing this we supposed that we were doing the very

best thing for our 8-13 of the property, and of course, putting your 5-13 on the same basis as our own investment,"—and asks Mr .Moran for suggestions as to any amendments or additions to the lease "that will place your ownership in any better position than it is.   *   *   ;   as we have but one object in view, and that is to get rid of a costly organization and to reduce the expense of operating the road to a minimum, and at the same time be able to control for it whenever necessary such equipment as will give to the line the greatest possible efficiency and earning for its owners," and says: "Rest assured, my dear sir, that you shall always find us endeavoring to protect all that are interested with us in property of a like character."

On May 11, Mr. Moran answered this to the effect that the assurances of Mr. Scott had removed all doubts, and the only thing remaining to be done was, "To so arrange the lease so that your successors may not do, by virtue of it, what I am sure you have no intention of doing."

A new form of lease was thereupon submitted to Mr. Moran, to which he objected in a letter, dated June 7, 1872, to Mr. Scott, because it contained no stipulation to protect the interest of the stockholders of the Muskingum Valley Co.; because under it the lessee could fix rates of toll against the interest of the lessor; could divert traffic from road of lessor; could make improvements at the expense of the lessor which the lessee may deem necessary, and asks out of what they shall be paid if they exceed the surplus earnings; because any difference is to be submitted to umpires appointed by both parties, when the lessee, owning a majority of stock of the lessor, controls the officers and through them the umpires; because the lessee could so manage the leased road as to render the foreclosure of the mortgage inevitable, and its sale produce little or nothing, and thus buy it in at the foreclosure sale; and he demands that the meeting of the directors of the Muskingum Valley Company be postponed.

This resulted in an interview between Mr. Scott and Mr. Moran.

Subsequently, at a meeting of the directors of the Pan Handle Company, held on June 10, 1872, the president laid before the board the matter of a lease of the Muskingum Valley Railroad, and made a statement of the views and desires of Charles Moran, owner of 5-13 of ' the stock of the Muskingum Valley Co., and it was thereupon resolved that the president of the company be authorized to execute a lease of the Muskingum Valley Railroad to this company on such terms and conditions as may be prepared by the counsel of this company and approved by the stockholders of the Muskingum Valley Company.

On October 12, 1872, Mr. Scott wrote Mr. Moran, "After going over all the matters connected with the M. V. Road, we are clear that the best thing to be done for its shareholders is to lease the road to the P. C. & St. L. Ry. Co. on the terms set forth in the enclosed lease, by which the shareholders will get all its returns," etc.

Mr. Moran, in his letters of October 15 and 18 to Mr. Scott, objects to the new proposed lease because it does not protect the stockholders of the Muskingum Valley Co.; he insists that examination of accounts and arbitration would be of no avail since the president of the Muskingum Valley Co. is appointed by and therefore only represents the interests of the Pan Handle Co., and he suggests nine modifications in the interest of the stockholders and bondholders of the Muskingum Valley Co., some of which look to the protection of traffic over the leased road and the regulation of rates of toll; that the Pan Handle Co., shall at no time make or prescribe any regulation adverse to the direction of traffic to or from the Muskingum Valley Road, nor place any impediment to the direction of traffic to the latter road; that the Little Miami Railroad should pro rate between Mor-

row and Cincinnati on all traffic to and from the Muskingum Valley Road, and permit the trains of the latter to run through to and from Cincinnati whenever it is necessary to the development of the traffic of the Muskingum Valley Co. at the usual mileage; that the tolls for through traffic over the Muskingum Valley Road shall be at all times the same as those charged by the Pan Handle Co. over their own road, and the latter company shall pro rate with the Muskingum Valley Co. on all through traffic going to points on either road; and one of which is as follows: "The P. C. & St. L. Co. shall guarantee that the net traffic of the C. & M. V. shall never be less than the amount necessary to pay the interest on the present first mortgage debt, and any deficiency, should there occur any, in the net earnings to meet the interest on said bonds, shall be made up by the P. C. & St. L. Co." Moran says: "This is just and proper because the latter company will entirely control the traffic of the C. & M. V. C., both as its lessee and as owners and lessees of the only outlets of the traffic of the C. & M. V. Co.," and suggests that it can only be through the fault of the Pan Handle Co. that the future earnings of the road should ever fall below those of the last year wihch showed a surplus.

Moran further suggests that the provision relating to the work required to perfect and completely finish the road, and as to the additions and improvements, and which were the same in that draft as in the lease finally executed, should be made to read that they may be made by the party of the second part (Pan Handle Co.) at the expense of the party of the first part, but no such expenditure for future work and improvements shall ever be made in excess of the surplus earnings after payment of the interest on the present mortgage debt, except with the assent of a majority of the shareholders of the Muskingum Valley Co. other than the shares owned or controlled by or held for account of the Pan Handle Co. and the Pennsylvania R. R. Co.

On November 15, 1872, Mr. Jewett wrote to Scott, Roberts and Moran, directors of the Muskingum Valley Co., with reference to a proposed issue of $500,000 second mortgage bonds to increase the equipment, and submitted the matter to them. Thereupon, on November 18, Mr. Moran wrote to Mr. Scott to the effect that he would consent to such issue providing that he, Mr. Scott, was satisfied that the road could pay the money to earn the interest. He says, "You know the present condition and future prospects of the road better than I do," etc. He further says: "What has made me somewhat uneasy as to the future of the C. & M. V. Co. is the absence of all assurance that a portion of the traffic should be permitted to go over the C. & M. V. Road, which I am sure is the road that can do it most economically when properly equipped."

He suggests the execution of the lease with the protection to the minority interests in the Muskingum Valley Road as suggested in his letter of October 18, and says that if the Pan Handle Co. fairly treats the Muskingum Valley Road there would never be any cause to exercise the rights reserved in favor of the minority shareholders.

On November 19, 1872, Mr. Scott wrote to Mr. Moran that he did not think the second mortgage bonds could be placed unless all the stockholders would take them pro rata. "Our idea of the Muskingum Valley line, if we had taken it under the lease, was to put on additional equipment and develop its coal trade with Cincinnati and to Cleveland, to effect which we have been endeavoring to arrange to get a line built from Dresden Junction, the point of connection with the P. C. & St. L. Ry. Co., over to the Cleveland & Mt. Vernon Road, a distance of about thirty miles. This would give the road a very good outlet to the lake at Cleveland, and

the coal would then find a large market. I am sorry that you take the view that you do of the lease, as we proposed it, because I am convinced that it was the true plan to bring it out for all the stockholders in common. Of course our company would not b e willing to assume the responsibility you name in your letter, but they are willing to work the line at its cost, and give the stockholders all the net results. This is all I think you in justice can ask them to do. Unless you will be prepared, in common with the other stockholders, to take your pro rata proportion of the bonds, I think it would be an unsafe proceeding to incur obligations looking to the negotiations of second securities. We might find ourselves in a very embarrassed position by such action.'' And he recommends the execution of the lease as proposed by Mr. Jewett, "and under it the line can be so developed without calling upon the stockholders as to ultimately make it a valuable property, in the meantime also providing that interest on the money now represented by the bonds in which you stand with us in common.''

This resulted in another interview between Mr. Scott and Mr. Moran. Mr .Scott, in writing to Mr. Jewett on November 27, in regard to said interview, says: "He (Mr. Moran) finally agreed that the lease should be executed on the basis prepared by you, with two clauses in addition, to the effect: 1st. That in the event of the net earnings of the line not being sufficient to protect the interest on the existing first mortgage bonds as it matures, the lessee should advance the needful means to pay the coupons at maturity, charging any such advance over the net earnings, in open account, to be returned out of subsequent earnings. 2nd. That any stockholder of the company should have the right, during the operation of the lease, to examine the books of the lessee to ascertain whether the conditions of the lease are being fairly complied with under the terms thereof.''

And at a meeting of the directors of the Pan Handle Co., held on November 27, 1872, Mr. Scott stated that he had had a conference with Mr. Moran on the subject of the lease, and that he (Moran) was willing to assent to a lease in the form proposed, provided this company would agree to protect the first mortgage bonds by advancing the needful amount if net earnings are not sufficient to pay interest, and that the holder of one thousand shares should have the right to examine the books.

Mr. Scott said he had agreed to both conditions, and thought a lease should be effected at once, and it was thereupon resolved: "That the officers of this company have a lease of the C. & M. V. Railway prepared by Mr. Jewett with the additional provisions that this company will advance the amount needful to protect the interest on the first mortgage bonds, if the net earnings are insufficient, and charge such advance against future earnings;'' also giving any sockholder right to examine the books, and that the same be submitted to a vote of the stockholders.

A correspondence follows which shows that there was a misunderstanding as to the terms agreed upon by Mr. Scott and Mr. Moran, and in the letter of December 4, to Mr. Scott, Mr. Moran says: . "I distinctly understood you to acknowledge that your company, having the control of the entire traffic of the C. & M.V. Road, would guarantee that its earnings should never be less than the amount needed to meet the interest on the first mortgage bonds.'' And in his letter Mr. Moran pleads for delay in the execution of the lease until terms can be agreed upon.

At a meeting of the directors of the Muskingum Valley Co., held on December 6, 1872, to consider a proposition from the Pan Handle Co. to lease the line of road of the Muskingum Valley Co., and to which meeting a draft of a lease was presented, a resolution was passed that a meeting of stockholders of the company be called for the purpose of considering the

proposition for lease and of assenting to or declining the same, and that the lease be submitted to the stockholders for their approval or rejection; that the president of this company be authorized to execute such lease, with such modification as may be consented to by Charles Moran, one of the directors of this company, to be submitted to this board for approval, after such modifications are made and before the meeting of stockholders.

On December 9, Mr. Jewett, president of the Muskingum Valley Co., wrote to Mr. Moran enclosing a copy of the lease as drawn under the direction of the directors of the Pan Handle Co., at the meeting of November 27; also a copy of the resolution passed by the directors of the Muskingum Valley Co. on December 6, saying: "You will perceive that the responsibility of the lease and the terms thereof is, by the board, confided pretty much to your hands. The action of the board thus far is not conclusive in any sense."

This lease provides for the advancement of money to pay interest, "charging any such advance over net earnings, in open account, to be returned out of subsequent earnings."

On December 10, 1872, Churchill and Fillmore, two of the directors of the Muskingum Valley Co., wrote to Moran, calling his attention to the fact that the Pennsylavnia Co. owned a majority of the stock of the Muskingum Valley Co.; also a majority of the stock of the Pan Handle Co.; that the proposed lease waives the protection given to minority stockholders, and the absolute control of the property is given to the lessee, and that therefore care should be taken as to its terms.

Moran answers this letter on December 13, and encloses his letter of December 12, which he had written to Mr. Scott, and suggests, if they think best, that an additional provision might be made, "that the interest on said bonds shall be paid on maturity without charge upon the future earnings of the C. & M. V. Railway."

On December 12, Mr. Moran wrote to Mr. Scott objecting to the form of the lease as then proposed, and insisted on modifications. At the end of the provision relating to additions and improvements he wishes the word "and" stricken out, and in place the words "the party of the second part but at" inserted. Another modification being that "whenever the net annual earnings of the leased road shall not be sufficient to meet the annual interest on said bonds, the deficit shall be supplied and made up by the party of the second part."

He urges that if the net earnings of the Muskingum Valley Road are less than at present it will be entirely due to the action of the Pan Handle Co.; that at present the net earnings of the Muskingum Valley Co. are more than sufficient to meet the interest, and that traffic on all roads is increasing. He suggests further that the Pan Handle Co. should pay the interest itself rather than go through the useless formality of paying the amount to the treasurer of the Muskingum Valley Co.

He further urges that to allow a deficit to accumulate against the Muskingum Valley Co. for interest on bonds would open the door for selling out the stockholders of that company for the benefit of the Pan Handle Company.

Mr. Moran enclosed a copy of this letter of the 12th of December, written to Mr. Scott, to Mr. Jewett, and on December 25, Mr. Jewett wrote to Mr. Moran: "Not being familiar with the several interviews you have had with Colonel Scott, I don't know that I fully comprehend the scope of the changes you propose. The earninsg of the C. & M. V. Co. are now fully equal to its present capacity with the present equipment upon it. To increase the earnings the capacity of the road must be increased by sidings and branches, depot buildings, etc., and the equipment

largely increased; and I cannot see upon what principle the lessee could be expected to make these additions, improvements, and furnish the increased equipments, without being in some way compensated out of the increased earnings to be realized, because of such improvements, etc., and in being in some way secured for the investment thus made in the event of the lease being for any cause cancelled or forfeited," etc.

This resulted in another meeting of Mr. Scott and Mr. Moran, and, as detailed by Mr. Moran in his letter to Mr. Churchill et al. on December 28, he seems to have been satisfied by the explanation of Mr. Scott as to the terms of the lease relating to the advancements of money to pay interest.

He says: "Mr. Jewett, president of our company, as well as Colonel Scott, calls my attention also to the fact that to increase the earnings of your road requires additional outlays for sidetracks, equipment, etc., and that the lessee can not be expected to incur them if they are to be at his sole charge so long as the earnings are inadequate to defray them."

He says that Mr. Scott assures him that the sincere desire of the Pan Handle Co. is to develop the traffic of the Muskingum Valley Road, and that they will do everything in their power to do so; but that for the time being they can not divert through traffic from their road over to it, "but this we can hardly expect them to do." And he and Mr. Scott seem to have agreed upon other modifications.

At a meeting of the stockholders of the Pan Handle Co. held on December 30, 1872, the president submitted the form of a lease of the Muskingum Valley Railway, and a resolution was passed ratifying and approving the lease upon the basis presented, and authorizing and directing the president or vice-president and secretary to execute the same, and confirming their action in the premises; and it was further resolved: "That if the board of directors of this company found it necessary to agree to any modifications of the said lease of the C. & M. V. Railway to obtain the assent of the C. & M. V. Ry. Co. thereto, such modifications shall be submitted to the next regular meeting of the stockholders of this company for their approval before the same shall go into effect."

A letter from Samuel Jeans was submitted, objecting to the lease.

The vote on the resolution was: In favor of the lease, 135,800 shares; against lease, 1,275 shares.

At this time the total stock of the Pan Handle Co. consisted of 168,671 shares, of which the Pennsylvania Company owned 75,576 shares, and the Pennsylvania Railroad Co. owned 60,009 shares. Of the shares voted for the resolution 135,585 shares were held by the Pennsylvania Company and the Pennsylvania Railroad Company.

On January 1, 1873, Messrs. Churchill and Fillmore, directors of the Muskingum Valley Co., wrote to Mr. Moran, expressing doubts as to the form of the lease and as to reliability to be placed on verbal explanations, and thereupon, on January 6, Mr. Moran wrote to Mr. Scott in answer to a telegram, asking him to decide in regard to terms of lease, that he was most anxious to meet his views so long as it can be done without risk, etc. "As you state, the advances to be made by your company, if any, to meet the coupons of the first mortgage bonds of the C. & M. V. Ry. Co. are only to be repaid out of future earnings during the lease, and cannot lead to the sale of the road and franchises, I am willing to give up my objections to this stipulation, but I think it will be to the interest of both companies that your company shall directly attend to the payment of these coupons, instead of passing the funds through the hands of the treasurer of the C. &. M. V. Co."

He suggests that all provisions as to arbitration be stricken out, leav-

ing all parties to their remedies in court, and suggests that the legal organization of the Muskingum Valley Co. should be kept up, and provisions should be made for the expenses of doing so.

He then says: "I have thus given up nearly every stipulation for the protection of the minority interests of the shareholders of the C. & M. V. Co., placing my interest entirely in your hands, and must look to you and your company to so arrange the affairs of the road as not to make me regret the confidence I have placed in you."

The letter contains a postcript to the effect that the lease should express in clear language that the Pan Handle Co. shall only look to the future earnings for reimbursement of any advances it may make to meet the interest on the first mortgage bonds, and that they shall not have power to sell the road and franchises through any advances they may make for construction account.

At a meeting of the stockholders of the Muskingum Valley Co., held on January 9, 1873, in accordance with notice, the lease was submitted, and an amendment was made adding the words "and not otherwise" at the end of the second item, and a further amendment was made by which the lessor covenants to keep up and maintain its corporate organization, and by which the lessee agrees to advance not exceeding $2,000.00 a year to defray the expense of maintaining the corporate organization of the lessor company, if the net earnings, after payment of interest, etc., are not sufficient. Thereupon the lease so amended was submitted to the vote of the stockholders, and 48,849 shares of stock were voted, all for the lease. It was thereupon resolved that the president of the company, under direction of the board of directors, be authorized to execute the lease and to do whatever other act was necessary to carry the same into effect.

At this time the total capital stock of the Muskingum Valley Co. consisted of 79,946 shares, of which the Pennsylvania Co. owned 48,618 shares; of the 48,849 shares voted in favor of the lease, the Pennsylvania Co. voted 48,618 shares.

At a meeting of the directors of the Pan Handle Co., held on March 17, 1873, a resolution was passed that the lease, so modified, be submitted to the stockholders at their annual meeting to be held on March 18, 1873, for their approval or rejection, and that upon said lease being approved by the stockholders, the president of this company be authorized and required to cause said lease to be executed in due form of law, and to do whatever else may be necessary to carry the same into effect.

At the annual meeting of the stockholders of the Pan Handle Co., held on March 18, 1873, the lease and the resolution of the directors of the Muskingum Valley Co., approving the lease in its modified form were submitted, and the stockholders proceeded to vote in favor or against the said lease, and 135,841 shares were voted for the lease, and no shares were voted against it. It was thereupon resolved, "That said lease be, and the same is, by virtue of said vote, hereby approved and ratified, and that the proper officers of this company, in pursuance of the resolution of the board of directors, proceed with the execution of said lease, and do any other matter or thing needful to carry the same into full force and effect, and that the lease be printed among the proceedings of this meeting.

Of the shares voted for said lease at this meeting, 135,576 were held by the Pennsylvania R. R. Co. and the Pennsylvania Co.

At a meeting of the directors of the Muskingum Valley Co., held on the ―― day of ――, 1873, the proceedings of the previous meeting as to the lease and of the meeting of the stockholders as to the same were read, and the president reported that said lease had been amended as required by the stockholders, and as amended had been duly executed, and in ac-

cordance with the provisions thereof the possession of the road and property of this company had been delivered to such lessee and was then being worked and operated by the same, and it was thereupon resolved: "That the action of the president in the matter of executing the said lease and delivering the possession of the road and other property to the lessee, is hereby approved."

The lease was executed on the 25th day of March, 1873, by H. J. Jewett, president of the Muskingum Valley Co., and by William Thaw, vice-president of the Pan Handle Co., and attested by J. A. Lippincott, secretary of the Muskingum Valley Co., and W. H. Barnes, secretary of the Pan Handle Co., and duly acknowledged. The Pan Handle Co. went into possession of the leased road under the terms of the lease.

The lease is executed by the Muskingum Valley Co. as party of the first part to the Pan Handle Co. as party of the second part. It is for the term of ninety-nine years from January 1, 1873, and covers the entire line of road, together with all the depots, stations, buildinsg, appurtenances and property, real and personal, to said demised railway belonging and appertaining, and it provides, among other things, as follows:

"That in consideration of the premises, the party of the first part hereby covenants and agrees that the party of the second part shall at all times during the term aforesaid have full and exclusive power, right and authority to use, manage and work the said railway of said party of the first part, and shall have the right to fix the tolls thereon (but not at a higher rate than is authorized by the charter of the party of the first part thereto); and further, that said party of the second part shall have full, free and exclusive right to charge and collect all of the tolls on and freight charges and dues to accrue from said road during the said term, and to appropriate the same in the way and manner hereinafter mentioned, and shall, have use, exercise and enjoy all the rights, powers and authority aforesaid, and all other lawful powers and privileges which can or may be lawfully exercised and enjoyed on or about the said demised railway and property, as exclusively, fully, amply and entirely as the same might or could have been used, exercised and enjoyed by said party of the first part had this lease and contract not have been made, and as exclusively, fully, amply and entirely as said party of the first part have authority by law to grant the same.

"The party of the first part further covenants that it will keep up and maintain its legal and corporative organization, and, so far as it may be necessary to the full protection of the rights and interests of said second party, to permit the said party of the second part to use such corporative name and to act in and by virtue thereof; and in consideration of the premises the party of the second part hereby covenants to and with said party of the first part as follows, viz: First, That the party of the second part shall and will at all times during the hereby demised term, work, use, manage, maintain, operate and keep in use the railway of the party of the first part, with its appurtenances, from its point of connection with the railway of the party of the second part at or near Dresden, Muskingum County, Ohio, to its termination at Morrow, Warren County, Ohio, as aforesaid, and will so work and efficiently operate said railway and appurtenances between the said points, with all such locomotives, cars, and rolling stock owned, controlled or used by them, the party of the second part, as shall in the judgment of the party of the second part reasonably be required for and properly advanced to promptly and fully accommodate the business thereof, and shall and will collect and receive all of said tolls, freight charges, and dues which shall accrue as aforesaid and apply and appropriate the same in the way and manner following, to-wit:

1st. The payment of the annual cost of repairing, maintaining and perpetuating for public use the railway property, and all the expenses of working, using managing, maintaining and operating and running the same, including eight per centum per annum upon the cost of such engines as the party of the second part, at its own expense, may put on said road, and the usual charge for car service for cars actually running, used and employed thereon, and not owned by said first party, premiums for insurance, and all tolls, taxes, or assessments, now or hereafter to be levied or assessed by the laws of the United States or the state of Ohio upon the traffic passing over said road and the property of the said party of the first part now or hereafter acquired by the party of the second part by and under this lease. "It being distinctly understood that certain work yet to be done and required to perfect and completely finish the said road hereby demised,. as well as such additions and improvements thereto as the parties of the second part shall determine to be necessary from time to time for the prompt and economical movement of the traffic on and over said road, shall be done by and at the expense of the said first party."

2d. To pay the surplus, if any thereafter remains, to the treasurer of the party of the first part, provided, however, that in the event of the net earnings of the line of road hereby demised not being sufficient to protect the interest on the existing first mortgage bonds of the party of the first part as it matures, the party of the second part shall advance the needful means to pay the coupons at maturity, charging any such advance over the net earnings in open account to be returned out of the subsequent earnings, and not otherwise."

There is evidence to the effect that first mortgage bonds of the company were bought and sold on the faith of the stipulation contained in this lease with reference to the payment of the interest on the same.

I think the evidence shows that at the time the lease was executed the line of the road was in an inferior state of maintenance; the rails, ties, road-bed, bridges, stations, buildings and shops were in, at all events, not a good condition, and repairs, additions and improvements were needed, and that the lessee expended about $140,000.00 in making additions and improvements, consisting of new side tracks, extension of old side tracks, new freight and passenger stations, permanent bridges in place of temporary structures, in solid embankments in place of temporary trestles, in substitution of steel rails for old iron rail, etc.

The road so leased was operated by said Pan Handle Co. from the time it took possession, in 1873, during the succeeding years to and including the year 1884, with the result as follows: There was a net loss in each of said years of from $18,000.00 to $14,700.00, except the year 1879, in which year there was a net profit of $5,142.00. The total net loss during said time amounted to $953,570.00. The Pan Handle Company advanced the interest in each of said years on the bonds of the Muskingum Valley Co., and the amount so advanced is taken in consideration as money expended by the Pan Handle Co. in determining its net loss as aforesaid.

The $140,000.00 expended for additions and improvements on said railroad was not repaid by the Muskingum Valley Co., and was counted in said net loss.

The road was operated during the year 1885 at a net loss of $171,000.

Mr. Estep, at the instance and under the employment of Robert Sherrard and J. T. Brooks, officers and stockholders of the Pan Handle Co. (Mr. Brooks being the general counsel and Mr. Sherrard being a director,) sought certain stockholders of the Pan Handle Co., informed them of the

nature of the lease and the burden of the same on the company, and the advisability of having it declared void.  Having obtained their employment, he formally represented to the Pan Handle Co. the burden of the lease and the fraud connected with its inception, and requested it to take steps to have it declared void; which the company formally refused to do. As a result, a petition was filed in the Common Pleas Court of Jefferson County, by Samuel Jeans, the Trustees of Cadiz township, the Trustees of Rumley Township, the Trustees of German Township (said townships being in Harrison County, Ohio), the Trustees of Steubenville township, Jefferson County, Ohio, and the city of Steubenville, Jefferson County, Ohio, being holders of 6,870 shares of stock of the Pan Handle Co., against the Pan Handle Co. and the Muskingum Valley Co., to restrain the Pan Handle Co. from using or advancing funds of said company to pay interest on the bonds of the Muskingum Valley Co. due July 1, 1885; setting up that the contract of lease in its terms and operation was a hard, oppressive and unconscionable agreement, and a fraud on the rights of the plaintiff; that by the terms of the lease the lessee could derive no benefit from said lease or the earnings of the road, in any event; that the agreement was entered into under a mutual mistake of important facts; that the consideration of the lessees' covenants had entirely failed; that the circumstances under which the lease was entered into constitute a fraud on the rights of the plaintiff and minority stockholders, and render said lease illegal and void, and asking that the Muskingum Valley Co. be enjoined from attempting to enforce said lease and agreement until final hearing, and that upon such hearing said lease and agreement may be brought into court, declared null and void, and cancelled, and that all further operation thereunder by either party be enjoined; and especially that the Pan Handle Co. be perpetually restrained from using the funds of said company to make any further advances of interest on said bonds, for the operation and maintenance of said leased road, or otherwise, under said lease and agreement, and for such other and further relief as may be equitable and proper.

The Muskingum Valley Co. filed a demurrer, but, not withdrawing the demurrer, the attorney withdrew from the case, under the direction of the vice-president of the company.    The Muskingum Valley Co. filed an answer which practically admitted the averments of the petition.

Thereupon the case came on for hearing, and on November 24, 1885, a decree was entered finding that the allegations of the petition were true, and that the plaintiffs were entitled to the equitable relief prayed for, and decreeing that the said lease "be and the same hereby is vacated, set aside and declared null and void," and ordering that the Pan Handle Co. deliver up to the Muskingum Valley Company the said railway property, etc., on or before January 1, 1886, and that said Pan Handle Co. be enjoined from operating said railway under said lease, etc., and from advancing any funds for the purpose of paying interest on the bonds of said lessor, or for operation and maintenance of said railway; and enjoining said Muskingum Valley Co. from enforcing said lease, etc.

On December 10, 1885, Evan J. Henry was made a party defendant and filed an answer, and thereupon gave notice of an appeal of the case to the circuit court.    His appeal was perfected on the 14th day of December, 1885.

On December 28, 1885, J. N. McCollough, vice-president of the Pan Handle Co., addressed a communication to the Muskingum Valley Co., notifying them of the decree in the Jefferson County Common Pleas, reciting its provisions, and saying:

"You are hereby notified that on the 1st day of January, 1886, this company will be ready to comply with said decree so far as the same

relates to the surrender of the demised property to the owner thereof, and hereby request that arrangements be made without delay for the transfer of said property with the least possible inconvenience in so doing; and that concurrent action be taken for making an inventory of the property so to be delivered to the lessor company, and for the purpose of agreeing upon the value thereof."

At a special meeting of the board of directors of the Pan Handle Co., held on February 10, 1886, this communication addressed by the vice-president of the company to the Muskingum Valley Co. was submitted, and the action of the vice-president therein was approved, ratified and confirmed.

At a meeting of the directors of the Muskingum Valley Co., held on December 30, 1885, Messrs. Messler, Churchill, Graham and Herdman were present. The president thereupon presented the decree of the court of Jefferson county in the Jeans case, also the notice which had been sent to said company by the vice-president of the Pan Handle Co. in regard to said decree as above stated.

Thereupon a resolution was passed as follows:

"Resolved, That in obedience to the decree of the Court of Common Pleas of Jefferson County, Ohio, in the suit of Samuel Jeans et al. v. Pittsburgh, Cincinnati & St. Louis Ry. Co., and the Cincinnati & Muskingum Valley Ry. Co., and in conformity with the notice dated December 28, 1885, served on this company by the Pittsburgh, Cincinnati & St. Louis Ry. Co., to the effect that they would be prepared on and after January 1, 1886, in accordance with the decree referred to, to surrender control to the Cincinnati & Muskingum Valley Ry. Co. of its railroad and other property heretofore leased to them, the president be and he is hereby authorized and directed to have issued and published notice in the form following, to-wit:

Cincinnati & Muskingum Valley Railway Company,

Zanesville, Ohio, December 30, 1885.

Notice is hereby given that on the 1st day of January, 1886, the Cincinnati & Muskingum Valley Railway Company will resume possession and control of its entire railway, and will operate the same in its own name and by its own employees from and after the date above named. All persons heretofore employed by the Pittsburgh, Cincinnati & S. Louis Railway Company directly in connection with the Cincinnati & Muskingum Valley Railway will continue to discharge the duties assigned to them unless heretofore otherwise specially ordered.

By order of the Board of Directors.

(Signed.)          Thos. D. Messler,

President.

At this meeting the following officers were elected: F. G. Darlington as secretary; John E. Davidson as treasurer; John W. Renner, auditor; G. W. Davis, general freight and ticket agent; and John H. Brasee, solicitor. Mr. Darlington had been connected with the management of the Pan Handle Co. and the Muskingum Valley Co. prior to January, 1886.

Mr. Davidson was also the treasurer of the Pan Handle Co. and of the Pennsylvania Co.

Mr. Renner was also the comptroller of the Pan Handle Co. and of the Pennsylvania Co.

Mr. Messler, the president of the company, was the third vice-president of the Pan Handle Co. and of the Pennsylvania Co.

Mr. Messler as president, Mr. Davidson as treasurer, and Mr. Renner as auditor of said Muskingum Valley Co., had their offices in Pittsburgh.

On January 1, 1886, these officers took charge of the road and commenced the operation thereof, and continued to operate the same in the name of the Muskingum Valley Co. The work ·had been done at Pittsburgh and Columbus in connection with the operating of the road, except that part of the work under the immediate control of the president was transferred to Zanesville. The superintendent and the operating officer in charge had, prior to January 1, 1886, reported for instructions to the general superintendent of the Pan Handle Co.; after that date he reported to and received instructions from the president of the Muskingum Valley Co.

Mr. Darlington acted as the superintendent, and appointed an engineer of maintenance of way and a train master.

An inventory was taken of the rolling stock, etc., as of January 1, 1886, containing a comparative statement to show an inventory of the rolling stock etc., on hand at the time the road was leased. This showed a deficiency which was supplied at the request of the Muskingum Valley Co.

After January 1, 1886, a number of contracts were made in the name of the Muskingum Valley Co. for the use of its tracks, etc., with other railway companies; property was condemned by the company, and sales and purchases of real estate were made by it.

At the annual meeting of the stockholders of the Muskingum Valley Co., held March 23, 1886, the following directors were elected: Thomas D. Messler, G. B. Roberts, Charles Moran, James Buckingham, M. Churchill, W. A. Graham and James Herdman. The report of the directors for the fiscal year ending December 31, 1885, was approved. The vote is not shown, but the whole number of shares voted at this meeting for the election of directors was 48,743.

In the report so approved the directors give a statement of the case of Jeans against the company in the Jefferson County Common Pleas Court, and of the decree, and say that under this decree the Pan Handle Co. gave formal notice under date of December 29, 1885, "that in obedience to such decree it would be prepared to deliver the road and equipment on January 1, 1886. This was done, and your company has been since operating the road in its own name."

Of the directors of the Muskingum Valley Co., Mr. Messler was also the vice-president of the P. C. & St. L. Ry. Co., and third vice-president of the Pennsylvania Co. George B. Roberts had been a director of the Pan Handle Co. Mr. Buckingham was the owner of twenty shares of stock in the company. Mr. Churchill was the owner of twenty-five shares; Mr. Graham was the owner of thirty-five shares, and Mr. Herdman was the owner of twenty shares.

At the annual meeting of the stockholders of the Muskingum Valley Co., held on Machr 22, 1887, the directors reported that under a decree of the Jefferson County Common Pleas Court, given in November, 1885, the lease of the road was annulled, and in accordance with the decree the road, etc., was delivered by the lessee to the Muskingum Valley Co. on January 1, 1886, and has since said date been operated in its name and by its officers.

This report was approved. The vote is not shown, but the whole number of votes cast at the election of directors at this meeting was 48,754 shares.

On September 9, 1885, Charles Moran, as trustee and in his own behalf and that of the holders of bonds of the Muskingum Valley Co. secured by mortgage, filed his bill in equity in the Circuit Court of the United States for the Southern District of Ohio against the Pan Handle

Co., the Muskingum Valley Co., Samuel Jeans and the other plaintiffs in the case in Jefferson County Common Pleas; setting out the said mortgage executed on September 1, 1870, by the Muskingum Valley Co. to him and J. Edgar Thompson, and to the survivor of them; that Thompson was dead; that said mortgage was executed to secure the payment of 1,500 bonds of $1,000.00 each; that the complainant was the holder and in his own right owned more than 400 of said bonds, and that other persons and corporations, including the Pennsylvania Co.—which Pennsylvania Co. is the holder of more than three-quarters of the stock of the Pan Handle Co.—are the holders and owners of the residue of said bonds, said Pennsylvania Co. being the holder and owner of a majority, viz.: 752 of said bonds, and 8-13 of the stock of the Muskingum Valley Co., and the complainant further sets up the lease by the Muskingum Valley Co. to the Pan Handle Co. and sets out the terms of the lease and makes a copy thereof a part of the bill, and further, that the lease went into full operation, and to June 30, 1885, all the terms thereof had been kept, and that "said lease and the performance thereof had been accepted by this complainant and by all the holders of said first mortgage bonds as an additional and further muniment of title, and ratified and adopted by them, and that the said lease and contract constitute a valuable muniment of title, as part of the estate and property mortgaged to the complainant." That all the coupons maturing upon the bonds until June 30, 1885, had been paid by said lessee to said bondholders through the agency of the complainant, except the coupons on bonds held by the Pennsylvania Co., which were settled between said company and the lessee; that faith and credit have thus been given to said bonds; that the suit brought by Jeans and others was a collusive scheme instigated by the lessee to terminate the lease; that the interest due on said mortgage bonds upon the 1st day of July, 1885, was not paid and was then in default; and that by such default the condition of defeasance of said mortgage had been broken and the estate of said mortgagee in said premises, including the rights of said mortgagor or lessor under said lease, has become absolute in law; that the Muskingum Valley Co. was insolvent, and that its property, irrespective of said case, is not of sufficient value to pay such mortgage bonds, and that the only method whereby the rights of the complainant could be secured to him is by the collection of said rents and the sale of said property with the benefit of said lease and contract, and the right to receive the annual rental for the term of said lease, in accordance with the provisions of said lease.

And the complainant prayed "for the appointment of a receiver to take possession of and collect the rental aforesaid, payable by the Pittsburgh, Cincinnati & St. Louis Ry. Co. to the Cincinnati & Muskingum Valley Ry. Co., under and by virtue of the provisions of said lease during the pendency of this suit, and that upon the final decree it may be held and established, notwithstanding said collusive suit and anything done therein, that the said lease and contract in equity belong and appertain to the holders of said mortgage bonds and to this plaintiff, as their trustee, as a muniment and part of their title, and that said lease and contract are valid, and that said holders and this complainant are entitled to enforce the same and to collect said rents as security for said bonds, and that all the estate and reversion of the lessor in said railway property, with the benefit of the lease aforesaid and the right to receive the rents accruing upon said lease and to enforce the performance of its covenants, may be sold and disposed of by a master commissioner to be appointed by this court, but without dispossessing the said lessee company of its possession or any of its rights under said lease, and for such other and further relief

as in equity and good conscience the complainant may prove to be entitled to."

To this bill the Pan Handle Co. filed an answer on October 31, 1885, in which it admits the execution of the mortgage in the bill mentioned, and the issuing of the bonds. It admits the execution of the lease by the Muskingum Valley Co. to the Pan Handle Co., and that the Pan Handle Co. took and had possession thereof to the then present time. It set out that the lessee had advanced about $140,000.00 for additions and betterments of the road, which the lessor had failed to repay, and that the lessor is unable to repay the same. It denies that the lease is a muniment of title as part of the assets mortgaged to the complainant, or that it was accepted by the holders of the bonds or ratified and adopted by them as such muniment of title, and it avers that the bondholders have no interest in said lease, and have nothing to do in relation thereto, except to receive interest on the bonds. It denies that the interest was paid by the lessee to the bondholders, but says it was advanced to the lessor company. It sets out that the lease had been a burden to the lessee; that it had been compelled to advance $140,000.00 for additions and betterments, and $800,000.00 to protect the interest on the bonds contrary to expectations. It denies that the Jeans suit is a collusive suit.

On November 27, 1885, Samuel Jeans and the other plaintiffs to the Jefferson county suit, filed an answer setting up matters to the same effect as in the answer of the Pan Handle Co., and further, that said contract of lease in its terms and operations, is a hard, oppressive and unconscionable agreement, and a fraud upon the rights of the respondents; that the agreement was entered into under a mutual mistake of important facts; that the consideration for the lessee's covenants has failed; that the circumstances, influences and means by which said agreement was brought about constituted a fraud on the rights of the minority of stockholders, and render it void; and further set up the suit in Jefferson county, and that on November 24, 1885, a decree had been entered in said case vacating and setting aside said lease and decreeing the same to be null and void.

And on December 8, 1885, the Pan Handle Co. filed a supplemental answer setting up the decree in the case in Jefferson County.

On February 1, 1886, the complainant filed an amended and supplemental bill setting up that the interest falling due January 1, 1886, was due and unpaid, and further that the collusive suit in Common Pleas Court of Jefferson County had proceeded to judgment without opposition on behalf of said Railway Company, except of a simulated and unreal character, and that Evan J. Henry, a stockholder of the Muskingum Valley Co., had appealed the case in Jefferson County Common Pleas to the cicruit court, and asking that the Pan Handle Co., in addition to the relief prayed for in the original bill, may be restrained from asserting the suit in Jefferson county, or any judgment therein, by way of a defense in any action at law which may be brought upon said lease or upon said coupons, or to enfocre the performance of any legal duty entered into between said railway companies.

To this the Pan Handle Co. filed an answer setting up that said case was defended by it, but that the president of the Muskingum Valley Co. had notified Charles Moran of the pendency of said suit, but that he failed to co-operate in its defense, and that the Muskingum Valley Co., having no means, therefore directed its attorney to give the suit no more attention, and denying that an appeal was perfected by the proceedings taken by said Henry.

Jeans and the other stockholders also filed an answer setting up in substance the same matter as contained in the answer of the Pan Handle Co.

The complainant filed a second supplemental bill setting up the accrual of other interest; that the appeal in the Jeans case had been dismissed in the Circuit Court of Jefferson County; that a petition in error had been filed in the Supreme Court of Ohio, and a supersedeas bond given whereby said dismissal was wholly superseded.

The Pan Hanlde Co. filed an answer admitting the appeal and supersedeas, but averring that the judgment of dismissal was in full force. Jeans et al filed a similar answer.

The case was heard by Hon. Howell E. Jackson, Circuit Judge, on the evidence, and in rendering his decision, Judge Jackson states the following as his conclusions:

"1.   That said lease having been executed subsequent to the mortgage, no privity of estate or contract was thereby created between the mortgagee and lessee; and it is the well settled rule, both in this country and in England, that in as much as no reversion vests in the mortgagee under such circumstances, he can not distrain or bring an action, either at law or in equity, for the rents payable by the tenant, nor is he entitled to enforce the covenants and provisions of the lease.  He has no election, either before or after the mortgagor's default, to adopt and demand the benefits of the lease without the consent of the lessee.  His remedy is to foreclose upon default of the mortgagor, to take possession of the premises, and thereby place himself in position to obtain the future profit.  Either step operates as an eviction of the tenant by title paramount, and leaves him at liberty to terminate the lease and quit.

"2.   That under the facts of this case there has been no attornment, actual or constructive, nor any 'equitable equivalent therefor by the lessee to the mortgagee so as to change the above rule, and his court has no power to compel such an attornment by the lessee, either to the mortgagee or the purchaser, under the forecoslure proceedings.  The relation of the landlord and tenant, as between the mortgagee and lessee, can only arise by the mutual agreement and consent of the parties.

"3.   The lease in question does not come within the description of the property, rights or franchises covered by the mortgage, nor is it in any sense 'after acquired property' within the meaning of these terms as used in said mortgage.  Even if the income, rents and profits of the road had been covered by the mortgage the personal covenant of the lessee to make 'advances' as provided in the lease could not be treated as 'income' of the road or as a part of the franchises of the mortgagor.  The subject of 'after acquired property' under mortgages containing similar provisions and clauses, has often been before the Supreme Court, but no case yet decided has gone to the extent of holding that personal contracts or covenants entered into with the mortgagor or by third parties subsequent to the mortgage, and under which no new estate is acquired by the mortgagor, come with those terms.

"4.   But if the lease were otherwise free from objection, if it was still in force as between lessor and lessee, and if it came within the description of the property, rights and franchises covered by the mortgage, so that complainant had precisely the same right to claim the benefit of its provisions which the mortgagor had (and certainly his rights could in no event rise higher than the mortgagor's), still this court would not compel the lessee to specifically perform the provisions of said lease or enfocre the lessee's covenant to make advances beyond the net earnings of the demised road sufficient to pay the interest on the lessor's bonds, and leave it to look alone to the future earnings of an insolvent road for its reimbursement, because the enforcement of that agreement would be grossly inequitable, unreasonable, hard, oppressive on the lessee, and without any equiva-

lent consideration, past, present or prospective, and because the lessor, to whose rights the complainant claims to have succeeded, is in default for large sums due the lessee, and which the complainant makes no offer to pay.

"5. The mortgagee, not being a party or interested in or entitled to the benefits of said lease and the covenants therein contained, and the lessee never having attorned to him, was not a necessary party to the suit of Samuel Jeans et al., in Jefferson Common Pleas, for the cancellation and annulment of said lease. The decree in that suit is conclusive on both parties to the lease, the lessor and the lessee, and it is wholly immaterial whether it was instituted at their suggestion or not. The lessor and lessee could themselves have vacated and terminated said lease by mutual agreement at any time."

Thereupon a decree was entered in the case dismissing the original and amended and supplemental bills as against the Pan Handle Co., Samuel Jeans and all defendants, other than the Muskingum Valley Co., and finding that the complainant is entitled to a decree against the Muskingum Valley Co., foreclosing its equity of redemption under the mortgage for the sale of the property specifically described in said mortgage, as though the lease mentioned in the bill of complaint had never been made or entered into, and such decree was accordingly ordered on the usual terms; but the formal entry of the decree was ordered to be postponed until after the complainant shall have taken an appeal against all the defendants, except said Muskingum Valley Co., and said appeal shall have been heard and determined, and the complainant prayed an appeal form the decree for dismissal, which was allowed.

The appeal was perfected, and the case taken to the Supreme Court of the United States.

At the annual meeting of the stockholders of the Muskingum Valley Co., held on March 27, 1888, the directors made a report as to the decree in the Moran case, and saying that the court declared "in effect that the lease was unconscionable in its character, inequitable in its provisions, and therefore should not longer be upheld against the Pittsburgh, Cincinnati & St. Louis Ry. Co." This report was approved. The vote is not shown, but the whole number of shares voted for directors at this meeting was 48,754.

At the annual meeting of the stockholders of the Muskingum Valley Co., held on March 22, 1892, a communication was submitted from Moran Bros., in regard to the case of Jeans et al., in Jefferson county, in which they offer to furnish counsel to take charge of the defense of the case and collect the rentals in arrears at their own expense.

A resolution offered to accept said offer was referred to the incoming board of directors. It does not appear that further action was taken on this resolution.

At this meeting the following directors were elected: Messler, Roberts, Moran, Buckingham, Churchill, Graham and Herdman. Roberts and Moran did not qualify, however. All the shares of stock represented at this meeting, viz., 75,459 shares, including the stock of Moran Bros., viz., 26,750, were voted for these directors.

At this time the Pennsylvania Co. must have owned about 48,612 shares of this stock; it owned 48,618 in 1873 and 48,612 in 1893.

The plaintiff in the case of Jeans et al. v. The Pittsburgh, Cincinnati & St. Louis Railway Company et al., pending in the Circuit Court of Jefferson County, dismissed their action on November 22, 1892.

On January 4, 1893, at a meeting of the board of directors of the Muskingum Valley Co., the following directors were present: Messler, Church-

ill, Graham, Herdman and Buckingham. A communication was received from Moran Bros., calling the attention of the board to the fact of the dismissal of the Jeans case, in Jefferson county, and claiming that the acceptance by the Muskingum Valley Co. of the surrender to it by the Pan Handle Co. of the railroad and property theretofore leased by the Muskingum Valley Co. to the Pan Handle Co. was illegal, and that there was no longer any claim that the lease was not valid and binding, and demanding that the board of directors of the Muskingum Valley Co. at once cause the Pan Handle Co. to be repossessed of the said road and property, and to require it to pay the eleven past due coupons to the bondholders of the Muskingum Valley Co., or to advance the sum necessary to pay the same. Thereupon the said directors, reciting the said letter and the decisions and judgment in the Moran case in the United States Court, and that the said Muskingum Valley Co. had not been able to perform its covenant in said lease as to additions and improvements, and that said company was in 1885 and ever since and for years prior thereto was, has been, and still is insolvent, and wholly unable to furnish such additions and improvements, and that the earnings of said road had for many years been insufficient to maintain and operate it and pay the interest on its mortgage bonds, and that the Pan Handle Co. had before January, 1886, advanced to this company more than $900,000.00 to protect the interest on said bonds, and that no part thereof had been or would probably ever be returned to it, and that it was the opinion of the members of the board that it would be useless and unconscionable on the part of this company to insist upon the further performance by the Pan Handle Co. while the company was in default and unable to perform its covenant; and that under these circumstances, on January 1, 1886, the Pan Handle Co. surrendered said leased property to this company, and this company resumed possession and control thereof, and ever since January 1, 1886, both companies have regarded and treated said lease as surrendered and terminated, and this company has had possession and control of said road and operated the same; and that this board does not regard its action in accepting the surrender of said railroad and property and terminating said lease as illegal; and that this board is unable to preceive any benefit to the holders of stock of this company from any attempt to resuscitate said lease, and that the bondholders have litigated in said suit in the U. S.. Court all their claims to rights under said lease.

"Resolved, That it is the opinion of this board that it is not its duty to attempt to revive said lease, or to cause the Pittsburgh, Cincinnati & St. Louis Ry. Co. to be repossessed of said railroad and property or to require it to pay the past due coupons in default to the bondholders of this company, or to advance the sum necessary therefor.

"Resolved, That in the opinion of this board it is equitable that said lease should be, and the same is hereby rescinded so far as it is within the power of this board to rescind the same.

"Resolved, That a certified copy of the foregoing preamble and resolutions be sent by the secretary to the directors of the Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. for such action thereon as may be deemed best to be taken by said directors; also that a certified copy of said resolutions be sent the Moran Brothers."

The directors testify that the matters set out in the preamble and resolution adopted at this meeting were true; that they acted on their own judgment to the best interest of the Muskingum Valley Co.; that neither the Pan Handle Co., the Pennsylvania Co., the Pennsylvania Ry. Co., nor any officer of either of said companies dictated to them or attempted to prevent the exercise of their own judgment in such matters.

At the annual meeting of the stockholders of the Muskingum Valley Co., held on March 28, 1893, the resolutions so adopted by the board of directors of said company on January 4, 1893, were submitted to the stockholders, and thereupon the following resolution was passed:

"Resolved, That the action of the board of directors of this company, as indicated in the resolutions adopted by them on January 4, 1893, in cancelling and declaring void the lease heretofore executed, between the Cincinnati & Muskingum Valley Ry. Co., and the Pittsburgh, Cincinnati & St. Louis Railway Company, dated December, 1872, to take effect January 1, 1873, be, and the same is hereby approved, ratified and confirmed."

The holders of 75,439 shares were present, or repersented, at this meeting, and the vote on said resolution was as follows:  48,689 shares were voted in favor of, and 26,750 shares voted against the adoption of said resolution.  The votes cast against the resolution were on the proxy of Moran Brothers.  The total stock of the company at this time consisted of 79,946 shares, of which the Pennsylvania Co. owned 48,612 shares. The shares voted for the resolution, to-wit.: 48,689 shares, represented more than a majority, but less than two-thirds of the entire capital stock of the company outstanding, and represented a majority but less than two-thirds of the holders of stock represented at said meeting and voting thereat.

A resolution directing the directors to surrender the possession of the property of this company to the Pan Handle Co., lessee, and to require said company to proceed and perform the obligations of the lease by operating the road, advancing money, etc., was defeated by a vote of 26,750 shares cast for, and 48,689 shares cast against its adoption.

At this meeting the following directors were elected:  Messler, Davidson, Brooks, Herdman, Graham, Churchill and Buckingham.  The stock of Moran Bros. was voted, with the other stock represented at the meeting, for these directors.

At a meeting of the directors of the P. C. C. & St. L. Ry. Co., the successor of the Pan Handle Co., held on January 5, 1893, the resolutions adopted by the board of directors of the Muskingum Valley Co. on January 4, 1893, was submitted, and thereupon the following resolution was passed:

"Resolved, That the formal approval and consent of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway, successor of the Pittsburgh, Cincinnati & St. Louis Ry. Co., to the rescission of said lease is hereby given; and said lease is hereby declared to be wholly rescinded and cancelled, so far as the P. C. & St. L. Ry. Co and the P. C. C. & St. L. Ry. Co. or either of them is concerned.

"Resolved, That a certified copy of the foregoing minute be sent by the secretary of the company to the secretary of the C. & M. V. Ry. Co."

At the annual meeting of the stockholders of the P. C. C. & St. L. Ry. Co., held on April 11, 1893, the resolutions adopted by the board of directors of said company on January 5, 1893, above given, were submitted to the stockholders, and thereupon the following resolution was adopted:

"Resolved, That the action of the directors of this company in giving formal approval and consent of this company to the cancellation of said lease, and declaring said lease wholly rescinded and cancelled so far as the Pittsburgh, Cincinnati & St Louis Railway Company and the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company are concerned, be, and the same is hereby approved and ratified."

Said resolution was adopted by the following vote:  336,598 shares were voted for said resolution, and no shares were voted against it.  The

shares so voted for said resolution represented more than two-thirds of the entire capital stock of the P. C. C. & St. L. Ry. Co. outstanding.

At this time the total capital stock of the P. C. C .& St. L. Ry. Co. consisted of 464,083 shares, of which the Pennsylvania Railroad Co. owned 46,519 shares, and the Pennsylvania Compnay owned 276,643 shares.

The appellant in the case of Moran v. The Pittsburgh, Cincinnati & St. Louis Ry. Co. et al., pending in the Supreme Court of the United States, appeared in court on October 17, 1893. And on his motion the appeal was dismissed.

During the years 1886 and 1893, both inclusive, the Muskingum Valley Ry. Co. was operated at a net loss of from $49,000.00 to $122,000.00 each year, counting the interest on the bonds as part of the expense; and during the year 1894 the road was run at a net loss.

Additions and improvements were made to the railroad as follows:

In the year 1886 the amount of $16,600.00.
In the year 1887 the amount of $16,003.00.
In the year 1888 the amount of $17,700.00.
In the year 1889 the amount of $19,300.00.
In the year 1890 the amount of $25,800.00.
In the year 1891 the amount of $ 9,600.00.
In the year 1892 the amount of $18,700.00.
In the year 1893 the amount of $10,600.00.
In the year 1894 the amount of $10,900.00.

A further sum aggregating over $100,000.00 was expended during these years for new steel rails.

These amounts so expended for additions and improvements are counted as expense in determining the net loss above given.

The coupons maturing on the said mortgage bonds of the Muskingum Valley Co. on January 1, 1886, were paid in November, 1886; those maturing on July 1, 1886, were paid in December, 1891; those maturing on January 1, 1887, were paid in December, 1892, and those maturing on July 1, 1887, were paid in March, 1895. The payment of the coupons maturing July 1, 1887, was made after the petition was filed in this case. On the payments being made, as aforesaid, the coupons were surrendered by the holders, cancelled and filed in the office of the Muskingum Valley Co.

## OPINION.

SAYLER, J.:

The plaintiff, Evan J. Henry, who sues in his own behalf and in behalf of all other stockholders of the Cincinnati & Muskingum Valley Ry. Co. who may see fit to join in the prosecution of this action and contribute to the expense thereof, brings the action against the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company and the Cincinnati & Muskingum Valley Railway Co. (and hereinafter for convenience called the Muskingum Valley Co.), setting up that he is and has been since 1870 the owner of 550 shares of the stock of the Muskingum Valley Co.; that the P. C. C. & St. L. Ry. Co. is the successor, by consolidation, of the Pittsburgh, Cincinnati & St. Louis Railway Company, with its line of road extending through Dresden Junction, etc., and the Chicago, St. Louis & Pittsburgh R. R. Co., with its line of road, etc.; that the Muskingum Valley Co. was the owner of the line of railroad from Dresden Junction to Morrow, and averring that the Pennsylvania Railroad Co. held control of the Pittsburgh, Cincinnati & St. Louis Railroad Co. (and hereinafter for

Vol. 2—11*

convenience called the Pan Handle Co.), and of the Muskingum Valley Co., through the majority of the stock of said companies owned or controlled by it; setting up the bonds issued by the Muskingum Valley Co., secured by mortgage on the line of road of said company; the payment of the coupons on said mortgage to and including those maturing on January 1, 1887; the maturity of the coupons maturing since the 1st of January, 1887, which remain unpaid; the lease executed by the Muskingum Valley Co. to the Pan Handle Co., and the possession taken by and the occupation of the lessee of the said road under said lease; and the advancement by the lessee under the provisions of the lease of the money to pay the coupons on said bonds to July, 1885; with a statement as to the Jeans suit in Jefferson county, and the subsequent transactions of the lessor and lessee with reference to the road and lease, claiming that the suit was not brought in good faith, that the defense made was a sham, and that by the dismissal of the Jeans suit the lease was left in full force and effect, and further claiming that the act of the directors of the Muskingum Valley Co., of December 30, 1885, was in the interest and at the instigation of the Pennsylvania Co. and of the lessee, and not in the interest of the lessor, and that the same was a pretended surrender of the railroad; that the raliroad continued thereafter to be operated by the officers and agents appointed by the lessee and in the interest of the lessee. That on March 22, 1892, Moran Brothers, stockholders of the Muskingum Valley Co., acting for the plaintiff as well as in their own interest, made a demand upon said company at the annual meeting of the stockholders to take action to enforce the said lease and to compel the payment of the sums agreed to be advanced, and to that end prepared and submitted resolutions providing for such action, which were referred by the stockholders to the board of directors, but the board of directors refused to take action. That on January 4, 1893, the plaintiff, by Moran Bros., having further made demand upon the directors of said Muskingum Valley Co., that they should at once cause the Pan Handle Co. to be repossessed of the railway of the said Muskingum Valley Railway Co. under the terms of said lease, the said directors by resolution refused to take any such action, and refused to take any steps to enforce said lease.

Wherefore the plaintiff says it is impossible to procure said Muskingum Valley Co. to take any action towards the enforcement of said lease, inasmuch as the said company is controlled by and acts under the direction of said Pennsylvania Co. and the said Pan Handle Co., which companies are controlled by the Pennsylvania Railroad Co.

Wherefore the plaintiff prays "that the validity, obligation and binding force of the said lease as against the said Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co., may be established by the judgment of this court; that the said company may be repossessed of the said demised premises, and compelled, during the residue of the term of said lease, to maintain and operate the demised premises at its own proper cost, expense and risk, and so to save the Muskingum Valley Co. and its stockholders harmless therefrom; that judgment may be rendered against the said Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. for the amount of the said coupons so in default and the interest thereon, and the interest on the said coupons which have been paid at dates later than the dates of maturity, and that said sums of money may be collected and distributed by the judgment of this court among the proper parties, holders of said bonds and coupons, who may appear to be entitled thereto by proof taken before a commissioner appointed by this court or otherwise, as to this court may seem best, and that the said last named company may be compelled hereafter to advance to the Muskingum Valley Company from time

to time, as the same may mature, all moneys necessary for the payment of said coupons as they mature until the maturity of the principal sum due and secured upon said mortgage aforesaid, and that, in all things, the said Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company may resume and be compelled to continue performance of the obligations and agreements of said lease until the end of said demise, and for such other and further relief as in equity and good conscience this plaintiff may, upon final hearing of this cause, prove to be entitled to."

Charles Moran, Daniel Comyer Moran and Amelia D. Moran, partners under the firm name of Moran Bros., file an answer and cross petition, setting up that they are shareholders of the Muskingum Valley Co. since 1870, as individuals and trustees, to the number of 28,250 shares; they admit the averments of the petition, and ask that they may be taken to have been made by them as fully and completely as if they were recited and fully set out in their answer and cross petition, and they join in the prayer of the petition.

The Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. files an answer, putting in issue the allegations of the petition, and setting up defenses to the action of the plaintiff.

The Muskingum Valley Co. files an answer, adopting the allegations, etc., of the answer of the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company.

It would seem that by reason of the demand made on the Muskingum Valley Co. to take action to enfocre the lease and to compel the payment of the sums agreed in said lease to be advanced, and the refusal of said company to comply with the demand of the plaintiff, with whom Charles Moran et al. join in a cross-petition, may maintain this action in behalf of himself and his co-stockholders, for the purpose of asserting the rights of the corporation. 18 Howard, 331; 18 Wallace, 626.

Provided the action "be a bona fide one, faithfully, truthfully, sincerely directed to the benefit and interest of those shareholders whom the plaintiff claims a right to represent." Forest v. Ry. Co., 4 De. Gex. F. & J. 126, 130.

In that case the court found that the plaintiff was a shareholder in a rival company, and brought the suit by direction of that company, who indemnified him against costs; that he was a puppet of that company, and therefore could not maintain the action.

And to the same effect are the cases in 54 Penn. St. 402; 1 Hemming & Miller, 489; 8 Law. Rep. Eq. Cases, 301.

It appears that the plaintiff is a bondholder, and that if this suit is successful, interest will be paid on his bonds. This interest in the matter certainly does not show mala fides on his part in bringing the suit under the rule laid down in Forest v. Ry. Co. supra.

If it be true that the lease is still in force as claimed by the plaintiff, the rights of the company with reference to the lease are involved, and the company, refusing to take steps to protect them, the plaintiff may maintain the action; but only to enforce the corporate right, not the individual rights of the plaintiff. 1 Morawetz on Corporations, 2 Ed. sec. 271.

The company certainly has a great interest in the action; its continued existence would seem to depend on the result. Yet it is contended by the defendant that the stockholders have no interest in the matter; that the action can in no way benefit them. I cannot appreciate this argument. The stockholder has an interest in the continued existence of the company and in the payment of its debts. It is true he is not liable on the bonds or for the coupons, but by the payment of the coupons, the property of the company is relieved from the debt and becomes more valuable to the corporation, consequently to the shareholder.

I think the evidence shows a combination of the Pan Handle Co. and Muskingum Valley Co. through the Pennsylvania Railorad Co. to cancel the lease, which presents a case of equitable jurisdiction for specific performance of the obligations of the lease. (Penn. Co. v. St. L. A. & T. H. R. R. Co., 118 U. S. 290.)

It is claimed by the defendants that the decree of the Circuit Court of the United States in the action brought by Charles Moran to foreclose the mortgage is, as to all questions, litigated and decided in said cause, binding and conclusive on the Muskingum Valley Co. and all of its stockholders.

The bill in the United States Circuit Court was filed by Charles Moran, as surviving trustee under the mortgage executed by the Muskingum Valley Co. and in his own behalf and that of the holders of bonds of the Muskingum Valley Co. secured by said mortgage for the purpose of foreclosing said mortgage, and claiming said lease to be in full force and covered by said mortgage under said lease to the payment of the bonds secured by said mortgage.

This action is brought by Evan J. Henry, an owner of capital stock of the Muskingum Valley Co., in his own behalf, and also in behalf of all other stockholders of the company who may see fit to join in the prosecution of said action and contribute to the expense thereof, for the purpose of enforcing the rights of the company under the lease—the company itself refusing to act—and Moran Brothers, as stockholders of said company, by a cross-petition, join in the relief prayed for.

The plaintiff cites Bigelow on Estoppel (4 Ed. 123, 5 Ed. 130), which lays down the rule that:

"Judgments, as a general rule, conclude the parties only in the character in which they sue or are sued," etc.

This is quoted and affirmed in 99 Ind. 496. Also in 102 Ind. 27. In 58 N. Y. 463, it is laid down that:

"A judgment against a party sued as an individual is not an estoppel in a subsquent action in which he sues or is sued, in a representative capacity."

And in 45 Cal. 444, the court say:

"In order to determine if the former judgment can be availed of as a bar in a subsequent suit, we must inquire whether the former litigation was between the same parties in the same right or capacity litigating in the subsequent suit," etc.

In the Moran case the issue was as to the right of the mortgagee to subject the rights of the Muskingum Valley Co. in the lease to the payment of the bonds. The court hold against such right. While the Muskingum Valley Co., lessor, and the Pan Handle Co., lessee, were both parties defendant, I do not see on what principle they could have had a hearing as to their respective rights under the lease so as to bring the case within 109 U. S. 163, or how the rights of the Muskingum Valley Co. in the lease could be adjudicated so as to bring the case within 22 Ohio St. 191.

I do not think, therefore. that the rights of the Muskingum Valley Co. sought to be enforced in this proceeding, areres adjudicata under the decree in the Moran case.

The defendants claim that the agreement of the lease was in its terms and operation greatly inequitable, unreasonable, hard and oppressive on said Pan Handle Co., and—claiming that the road and property had been surrendered to the lessor and that the lease had been terminated by the act of the parties—that the re-establishment of the lease and the enforcement of its provisions against the P. C. C. & S. L. Ry. Co. would be

grossly inequitable, unreasonable, hard and oppressive on said company, and without any equivalent consideration, past, present or prospective.

I think equity will grant specific relief under a contract when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; but that it will withhold such relief when it appears that, from circumstances connected with its inception, the enforcement of the contract would be unreasonably harsh and oppressive, or when it appears that the contract was fair and just when made, but from subsequent events its enforcement would be unreasonably harsh and oppressive; and without any corresponding advantage to the party seeking performance.   Trustees of Columbia College v. Thacker, 87 N. Y. 311, 317; Amerman v. Dean, 132 N. Y. 359; Willard v. Taylor, 8 Wall. 557, 566; P. C. R. R. Co. v. C. J. R. R. 13 Ohio St. 544, 556.   Also to the same effect:   36 Iowa, 253; 36 Ohio St. 24; 43 Ohio St. 178, 183; 1 C. C. R. 275; 3 Pomeroy Eq. Opinion, sec. 1405.

Were there circumstances connected with the execution of the contract of lease which would render the enforcement of its covenants against the lessee unreasonably harsh and oppressive?

On the reorganization of the Muskingum Valley Co., in 1870, a large majority, but less than two-thirds, of its capital stock, was distributed to the Pennsylvania Railroad Company and to the Pan Handle Company, and said stock was transferred to the Pennsylvania Company in 1872, and has been held by it since that time.

During this time, and until 1890, the Pennsylvania Railroad Company and the Pennsylvania Company held over two-thirds of the capital stock of the Pan Handle Company, and the Pennsylvania Railroad Company owned and held the entire stock excepting a small amount outstanding for the purpose of qualifying directors of the Pennsylvania Company.

This ownership of stock in the Pennsylvania Railroad Company gave that company the entire control of the Pan Handle Co., and the control of the Muskingum Valley Co., in all matters save where the concurrence of two-thirds of all the stock was required.

Of the seven directors of the Muskingum Valley Co. in 1872 and 1873, three were also directors of the Pan Handle Co.; Mr. Jewett, the president of the Muskingum Valley Co., was the general counsel of the Pan Handle Co. and a director and general counsel of the Pennsylvania Co.; Mr. Scott, one of the directors of the Muskingum Valley Co., was the president of the Pan Handle Co., and, as stated in the argument, of the Pennsylvania Ry. Co.

The history of the transaction, as shown in the letters and in the action taken by the directors and stockholders of the lessor and lessee, shows a determination on the part of the lessee, represented by Mr. Scott, to obtain a lease upon the Muskingum Valley Road.   Mr. Scott was able, through the Pennsylvania R. R. Co., to control the directors of the two companies, and to control the vote of two-thirds of all the stock of the Pan Handle Co., but could control the vote of only a majority of the stockholders of the Muskingum Valley Co.

Moran Bros. could control the vote of one-third of the stockholders of the Muskingum Valley Co., and it was therefore within their power to defeat any action of that company which required the approval of a two-thirds vote of the stockholders.

From the time a lease was submitted to Mr. Moran, representing the minority stockholders, in May, 1872, to the time of the meeting of the stockholders of the Muskingum Valley Co., on January 9, 1873, there was a continual pressure on the part of Mr. Scott to have the lease executed, and a continual resistance on the part of Mr. Moran to its execution upon

the ground that the terms of the proposed lease did not protect the minority stockholders and the bondholders of the Muskingum Valley Co.

During this time the rights of all the parties were fully discussed and fully understood. The various drafts of the leases were drawn on behalf of the lessee by the officers of the lessee; the lease which was finally executed was drawn by Mr. Jewett, president of the lessor, but also the general counsel of the lessee.

Mr. Jewett, as president of the Muskingum Valley Co., certainly had full information of the condition of the road, of its earning capacity, of its prospective value as a feeder for the proposed lessee, and it may be assumed that he, as general counsel for the proposed lessee, advised Mr. Scott fully. Mr. Scott, as director for the Muskingum Valley Co., should have had, and in all probability did have, all such information independent of the advice of Mr. Jewett.

In the negotiations it was apparent that Mr. Jewett, as president of the Muskingum Valley Co., and Mr. Scott, as president of the Pan Handle Co., were acting in unison, and for the same purpose. They evidently thought a lease was for the benefit of both companies; that thereby the Pan Handle would get the advantage to be derived from the operation of the Muskingum Valley Road in connection with its road, that the business of the Muskingum Valley Road could be operated at a less expense proportionately, and that its business would be developed to the advantage of the stockholders of that company. They could control the necessary two-thirds vote of the Pan Handle stockholders, but they could only control a majority of the stockholders of the Muskingum Valley Co. Consequently, negotiations with Mr. Moran, who controlled one-third of the stock of the Muskingum Valley Co., became necessary, and for the purpose of obtaining the consent of Mr. Moran concessions were made after due deliberation and with full knowledge of the circumstances. It would not seem that Mr. Scott or Mr. Jewett, representing the owners of the roads, would have made these concessions had they not known that they were proper to be made.

It is claimed that they were acting under the prevailing power of and in the interest of the Pennsylvania Railroad Co., the owner of a large majority of the stock of the Pan Handle Co. So long as the Pennsylvania R. R. Co. controlled by the election of directors and by the vote of its stock in the two companies, in a legal manner, and without fraud, and so long as the officers so elected by it acted without fraud, it seems to me their acts would be legal.

It was understood by all parties that it was in the power of the Pan Handle Co. to so operate the leased road in connection with its road as to increase or diminish its earnings as it would see fit. This is repeated by Mr. Moran in his letters.

The road and property was placed in the hands of the Pan Handle Co., in confidence that it would be operated in such manner as to make the arrangement a success.

Mr. Moran, in his letter of January 6, 1873, to Mr. Scott, says:

"I have thus given up nearly every stipulation for the protection of the minority interests of the shareholders of the C. & M. V. Ry. C., placing my interest entirely in your hands, and must look to you and your company to so arrange the affairs of the road as not to make me regret the confidence I have placed in you."

Have subsequent events transpired which would render the enforcement of the lease a hardship or an injustice to the lessee?

It is clear from the evidence that in the operation of the road under the lease from 1879 to 1885, the lessee expended large sums of money in excess

of the amounts received from the road, and that, in the operation of the road from 1886 to and during the year 1894, large amounts were also expended in excess of the amounts received, and that additions and improvements became and were necessary during said time.

If we should consider simply the amount of earnings received from the road, and the amounts expended in its operation during these years, the contract of lease would certainly appear to be a hard one.

But it seems to me, under the authorities, the subsequent events, which would relieve the lessee from the covenants of the lease, must be such as could not have been reasonably foreseen.

The court, in B. E. & C. R. R. Co. v. N. Y. L. E. & W. R. R. Co. (123 N. Y. 316), say on page 330:

"A contingency has happened in the case not within the contemplation of either of the parties to the contract, to-wit: The continuous failure of the plaintiff company to earn money enough to pay all of its operating expenses, etc    *    *    Under these circumstances no specific performance will be decreed."

In that case the company was chartered in 1881; the contract was made in 1883; in 1882 the road had earned more than enough to pay operating expenses and interest and a dividend to its stockholders. The operation of the road was left in the hands of the company owning it. It would seem, under these circumstances, that the parties might reasonably anticipate success in the future operation of the road, and that failure would be a disappointment. The court say:

"It never could have been contemplated that the company would permanently cease to earn enough even to pay operating expenses, and it cannot be supposed that it was ever in the thoughts of the two officers of either of the two companies that the time would speedily come when such a contingency would arise and seemingly become fixed a financial condition." Ib. 328.

In the case at bar, however, the original company was organized in 1851; in 1857 the mortgage securing the bonds was foreclosed for default in payment of interest; a new company was organized, and in 1869 its mortgage securing the bonds, was foreclosed for default, in payment of interest.

Thus, in a history of nearly twenty years, the owners of the road had not been able to make sufficient out of its operation to pay the expenses of operation and interest.

On the reorganization by the present company in 1870 the road was extended to Dresden Junction, thereby probably increasing its earning capacity; but its bonded debt was also increased.

In the year ending March, 1872, it was operated at a profit over and above all expenses and interest on its bonded indebtedness, and representations were made during the year 1871 and 1872, by the officers of the company, that the road was earning sufficient to pay its expenses and the interest; but for the next fiscal year ending in March, 1873, it was again operated at a loss.

So that during all but one yaer, out of some twenty two years, prior to the execution of the lease, the road had been operated at a loss.

The repairs, additions and improvements which were necessary on the road for its successful operation at the time it passed into the hands of the lessee, are strong evidence that the companies owning it prior to that time had not been earning sufficient money out of the road to put it in good condition, or keep it in good condition.

Could the lessee, with full knowledge of these facts, reasonably anticipate that the road, depending upon its own resources, would be able to

earn in the future more than it had in the past, or was earning during the year in which the lease was executed?

The fact that, subsequent to the execution of the lease, competing roads were built, would hardly relieve the lessee in this matter, as it would hardly count on having no competition during the term of the lease.

It is evident that Mr. Moran, representing the minority stockholders, did not anticipate that the road would earn sufficient to pay the interest. It was for this reason, as shown by his letters, that he fought so long, and finally with success, for a covenant in the lease providing that the lessee should advance money to pay the interest on the bonds in case of a deficiency. It was his opinion that the earnings of the road would depend entirely upon the operation of the same by the lessee in diverting traffic to or from the same; that if the lessee would permit traffic to go over the leased road from its road, which he urged would be the most economical way of doing the business, the operation of the leased road would be made profitable; and that in the absence of such manner of operating the road the results would be doubtful.

Mr. Scott was more hopeful. Thinking, and urging on Mr. Moran in his letter of November 19, 1872, that by putting on additional equipment and by developing its coal trade with Cincinnati and Cleveland through additional connections, the road could be developed without calling upon the stockholders as ultimately to make it a valuable property.

But Mr. Moran was apparently not satisfied, and still insisted upon the covenant, that the lessee would advance the money to pay the interest, the sums so advanced to be repaid only out of the future earnings. The reluctance on the part of Mr. Scott with which such covenant was incorporated in the lease would indicate that Mr. Scott had very little faith in the future prospects of the road, so far as its earning capacity was concerned. In fact, in that letter he wrote that they might find themselves in a very embarrassed condition by issuing additional bonds unless the stockholders would take them.

It is claimed that the lessee could derive no profit from the lease or the earnings of said railroad in any event, as the entire net earnings were to be turned over to the lessor company.

Mr. Scott, in his letter of November 19, 1872, in discussing the question of the lease, says that his company, the Pan Handle, is "willing to work the line and give the stockholders all the net results."

This purpose of the Pan Handle Company is carried out in the lease. It was, therefore, contemplated during the time the negotiations for the lease were going on, and at the time the lease was executed, that the Pan Handle Co. should derive no profits from the earnings of the road in any event.

But it does not appear that the lessee would derive no profit from the lease.

Considering all the circumstances in the case, it seems to me the purpose of Mr. Scott in obtaining a lease on the road for the term of ninety-nine years—and in order to obtain which he was willing to make the concession required by Mr. Moran—was that the road would thereby become a permanent feeder for the Pan Handle lines; that thereby the Pan Handle lines would get the advantage which might accrue to them by operating the road in connection with them during the term of the lease.

This seems to be the only reasonable solution of the acts of the parties.

It is claimed under Gear on Landlord & Tenant, sec. 11; Fry on Specific Performance, sec. 932; 1 Young & Collier, 341; 8 Vesey, 92; 3 Hill Ch. 140, that the agreement will not be specifically enforced because the lessor is insolvent. But the lessor was insolvent, as set up in the answers,

and, as I think, to the knowledge of all parties, when the lease was executed. Its insolvency is not a subsequent event. The contract was made by an insolvent corporation.

The money to be advanced to pay interest was to be paid out of the subsequent earnings of the road, and not otherwise. Therefore, as the lessee could have no claim over against the lessor for the same, it is immaterial whether the lessor was solvent or insolvent. In that respect this case is distinguished from 123 N. Y. 316, supra., in which the court found there was no obligation on the part of the company receiving the money to repay the same.

The judge of the United States court, on practically the same testimony that has been submitted to me, has held that "that court would not compel the lessee to specifically perform the provisions of said lease or enforce the lessee's covenant to make advances beyond the net earnings of the demised road sufficient to pay the interest on the lessor's bonds and leave it to look alone to the future earnings of an insolvent road for its reimbursements, because the enforcement of that agreement would be grossly inadequate, unreasonable, hard, oppressive on the lessee, and without any equivalent consideration, past, present or prospective, etc."

I can only say that, under the authorities, and in view of all the circumstances of the case, I can not agree with the learned judge of the circuit court in his view of the harshness of the contract.

That the enforcement of the contract would be a benefit to the lessor is manifest. It would pay its debt' and would protect its property from being sold under the threatened decree of foreclosure.

It is claimed on behalf of the defendant that the condition of the lease that the lessee will advance the needful means to pay coupons at maturity in the event the net earnings of the leased road are not sufficient to protect the interest on the first mortgage bonds as it matures, was an agreement to lend the money to the lessor in expectation of being repaid, and that, as the lessor is insolvent, and as repayment will not be made, a court of equity will not enforce the agreement; and counsel cite the Eldred and Cuba R. R. Co. v. The New York, Lake Erie & Western Ry. Co., 123 N. Y. 316, in support of the proposition.

The Eldred Road, connecting with the Erie Road, had been constructed by parties in interest with the Erie Company with a view of contributing business to the Erie Company, and the Eldred Company needing assistance form the Erie Company, agreed with that company: First, To deliver all freight and passengers to that company for transportation that it could control or influence, and to use its influence to promote the interests of that company; and, Second, For the purpose of protection of the Erie Company in rendering assistance to the Eldred Company under the contract, the Eldred Company would cause to be deposited with the Erie Company a majority of the capital stock of the Eldred Company, upon which, as long as the management of the Eldred Company shall be satisfactory to it, the Erie Company would give the right to vote to such representative of the Eldred Company as shall be designated by it.

The Erie Company agreed: First, To use its influence to promote the interests of the Eldred Company; and, Second, "That upon condition that the corporate control of the Eldred Company shall become and remain vested in the Erie Company, as above provided, the Erie Company will make good any deficiencies in the net earnings of the Eldred Company, to meet the interest upon its present bonded indebtedness from time to time as the same becomes due and payable, and for any and all advances so made by it, with interest thereon, as well as for any and all advances made to said Eldred Company by the Erie Company for other

'purposes, with interest thereon, the Erie Company shall have, and is hereby granted, a first lien upon the railroad franchises and property of the Eldred Company next after its bonded indebtedness aforesaid, and a first charge upon its surplus earnings next after the payment of the accruing interest upon its said bonded indebtedness.''

The Eldred Company duly performed the agreement on its part, and, there being a deficiency in the net earnings to meet the interest on its bonded indebtedness, and the Erie Company failing to make the same good, the Eldred Company brought an action for an account and asked for judgment for the amount that should appear to be due on the account. A decree in favor of the plaintiff was entered in the court below, which was ''substantially a decree for the specific performance of a simple contract to advance money to the plaintiff company.''

The Court of Appeals say, p. 325: ''Generally speaking, equity does not decree a specific performance of such a contract. This case is sought to be distinguished form this general rule by the fact that the defendant, under this contract, while bound to make the advances, even if there were an entire failure of net earnings, had no right under it to claim repayment of such advances until net earnings should be made, and that the repayment must proceed from such fund. It is urged that this is one of. the chances taken by the defendant when it agreed to make such advances, and that the consideration for such agreement to advance and to rely for repayment upon the future existence of a fund arising from the earnings was to be sought in the other part of the agreement by which the defendant was to reap the advantage of the so-called traffic arrangement between the two companies.''

But the court say, p. 337: ''The whole substance of the agreement, so far as the advances are concerned, is that an obligation is assumed by the defendant to advance money enough to make up any deficiency in the net earnings to pay the interest on the bonded indebtedness of the plaintiff company, and that company was placed thereby under an equal obligation to repay to the defendant the amount of such advances upon demand, or, in other words, immediately. Such an obligation is not the subject of a decree for a specific performance in equity. If there be any remedy at all, that remedy is at law, by a recovery of damages.''

. And the court holds that in an action at law there must be proof of damages, and says:

''And it is equally plain that it must be a rare case indeed where it can be said that a person has sustained any damages by the refusal of another to advance money which he has agreed to advance, where the person to whom it is to be advanced is by the agreement under a valid obligation to pay it back immediately.'' It is therefore clear that the reason of the court in holding in this part of its decision against the claim of the plaintiff, was because, under the agreement, there was an obligation on the plaintiff to repay such advances as should be made by the defendant; that the provision for a lien on the franchises and property of the company and a charge on the earnings were in the nature of securities for the obligation of repayment.

The first drafts of a lease submitted by Mr. Scott to Mr. Messler contained no provision relating to the repayment of the coupons by the lessee. To this objection was made. He wanted a guaranty on the part of the lessee to pay the interest.

After much negotiation another draft of a lease was submitted, with a stipulation that in the event the net earnings of the leased line were not sufficient to protect the interest on the mortgage bonds as it matures, the lessee ''shall advance the needful means to pay the coupons at maturity,

charging any such advance over the net earnings, in open account, to be returned out of subsequent earnings."

But this was still not satisfactory. Fears were had and expressed that there could be a recourse on the lessor for the money advanced. The fears were quieted by the assurances of Mr. Scott, but Churchill and Fillmore were not satisfied, and so wrote Moran, and as a result Moran wrote his letter of January 6, 1873, with a postscript to the effect that the lease should express, in clear language, that the Pan Handle Co. should look only to the future earnings of the leased road for reimbursement of any advances, and as a result of these further negotiations, at the meeting of the stockholders of the Muskingum Valley Co., on January 9, 1873, the words, "and not otherwise," were added to the stipulation in the lease as to the reimbursement of money advanced.

It seems to me clear, from the history of this stipulation in the lease, that the intention of the parties was that the lessee should have no recourse on the lessor company for advances made. The lessee should look only to the subsequent earnings of the road, and the lessor company was not placed under an obligation to repay to the lessee company the amount of any such advances. The consideration for such agreement to advance and rely on the subsequent earnings of the leased road for repayment, is to be sought in the other part of the agreement, by which the lessee was to reap the advantage growing out of the control of the leased road.

It would seem, therefore, that the contract in this case for the advancement of money to meet the interest on the mortgage bonds of the lessor company is distinguished from the contract in the 123 N. Y. case in the point on which the decision of that court in this part of its decision turned.

The defendants further claim, "that in said alleged agreement of lease it was expressly provided that said Muskingum Valley Co. should, at its own expense, perfect and completely finish its said railroad, and should also, at its own expense, make and finish such additions and improvements thereto as said Pan Handle Co. should determine to be necessary from time to time for the prompt and economical movement of the traffic on and over said road; that said Muskingum Valley Co. was unable and wholly failed to perform said covenant on its part to be performed, and by reason thereof said Pan Handle Co., in order to operate said road with safety, was compelled to and did expend for said purpose up to December 31, 1884, the large sum of $140,000.00 and over, and that said Muskingum Valley Co. has not refunded said sum, or any part thereof, and has not been and never will be able to do so."

The lease provides, "that certain work yet to be done and required to perfect and completely finish the said road hereby demised, as well as such additions and improvements thereto as the parties of the second part shall determine to be necessary from time to time for the prompt and economical movement of the traffic on and over said road, shall be done by and at the expense of the said first party."

It is claimed by the plaintiff that the money to pay for the additions and improvements was to come from the gross receipts and be paid as an addition to operating expenses; that this provision is in form and fact a provision to an agreement for the appropriation of the earnings of the property, and in legal effect is a stipulation and nothing more, that there should be added to the operating expenses before the ascertainment of the net earnings or "surplus" the amount of these betterments to be settled between the parties as best they might; then to pay the surplus, if any should thereafter remain to the treasurer. If, however, the provision is to be treated as a covenant, it is an independent covenant, and the con-

sideration is the promise, not its performance.   It is claimed by the defendants that, while this stipulation is included in the part of the lease providing for the disbursement of the earnings, it is not a part of the same; that it is a specific stipulation under which an obligation rests on the Muskingum Valley Co. to make the additions and improvements or to repay the expense of the same; that the agreements of the lessee under the lease are dependent upon the performance by the lessor of its stipulation to make the additions and improvements; that the covenants are dependent, or at least mutual.   But whether the covenants are dependent or independent is immaterial, as a court of equity will not grant specific performance if it would be inequitable or unconscionable, and that the stipulation in regard to the additions and improvements was an important one. It was a large part of the consideration for the agreement on the part of the Pan Handle Co. to maintain and operate the railway and to collect and apply its income; a failure to make the betterments would essentially interfere with the beneficial enjoyment of the premises leased.

The defendant, by its answer, avers that the "Muskingum Valley Co. operated the railroad and property up to May 1, 1873, and its earnings were insufficient by a very large amount to pay the interest which matured on its said bonds, and said company was insolvent throughout the years 1872 and 1873, and up to and through the year 1885," etc.   It seems to me that the evidence in the case fully establishes this averment. While it appears that in 1872 the road was run at a net profit, yet it appears that for the year ending March 31, 1873, it did not produce a sufficient amount of earnings to pay the interest on its bonds.   While a balance may be figured out from the reports to have been in the hands of the company in April, 1872, yet it appears all through the case that the company was not then and never had been in a condition financially to pay the interest on its bonds and to maintain its road in a manner necessary for the prompt and economical movement of the traffic.

It is claimed by the defendant "that not long after the lease was made the Valley Company became wholly insolvent, and has ever since remained so.   When the improvements and additions were made by the Pan Handle Co., the Valley Co. had no means, and was insolvent."   But it seems to me, under the answer of the defendant and under the evidence in the case, the Muskingum Valley Co. was insolvent at the time the lease was executed, and has been insolvent long prior thereto.

At the time of the execution of the lease all the property of the Muskingum Valley Co. went into the possession of the lessee.   That no property was left in the hands of the lessor is apparent from the provisions in the lease, that the lessee should advance not to exceed $2,000.00 a year to defray the expenses of maintaining the corporate organization of the company if the net earnings of the road under the lease should not be sufficient.

The lessor had nothing out of which to pay the expenses for additions and improvements except the net earnings which it might receive under the lease.

These are the circumstances under which this agreement as to additions and improvements was made, and it must be construed with reference to them.   It was clearly not contemplated that the lessor should pay such expenses on demand, as by the act of the lessee in taking possession of the property, the lessor was deprived of its capacity to earn money, and it was only in the event that the lessee should operate the road in such a manner as to produce a surplus of earnings that the lessor would have anything with which to pay.

It could hardly have been contemplated that the payment should be a condition precedent to the continuation of the lease, as, if it were, then

the contract of the lease, which was for ninety-nine years, had, to the knowledge of the parties, that within it which destroyed it almost at its inception.

It is contended, however, that if the Muskingum Valley Co. had no other recourses, the parties may have expected that in case of necessity therefor the stockholders or the bondholders would contribute funds to enable it to make such additions and improvements.

I do not think the circumstances, as shown by the evidence, indicate any intention on the part of the stockholders or of the bondholders to make any further advances. They were willing to issue more bonds providing Mr. Scott thought the earnings would be sufficient to pay the interest; but he was fearful, and the bonds were not issued.

It is true the constitutional liability of the stockholders for the payment of debts existed, but there is nothing to indicate that the parties contemplated payment of this debt by the enforcement of this liability.

In the letter of June 7, 1872, Mr. Moran objects to this provision, and asks out of what the expense shall be paid, if they exceed the surplus earnings; and in the letter of October 18, 1872, he suggests that the provision be made to read that no expenditures for such work shall ever be made in excess of the surplus earnings after payment of interest, etc.

An interview was had between Mr. Moran and Mr. Scott, at which many things seemed to have been agreed upon, and on another draft of the lease being subsequently submitted to Mr. Moran, containing the same stipulation, Mr. Moran, in his letter of December 12, 1872, makes no objection to the provision further than to suggest that it be changed so as to provide that the work be done by the lessor in place of the lessee. That Mr. Moran was at this time not unmindful of claims accumulating against the lessor which the lessor might be called upon to pay, is shown by his remonstrance in this letter against any claim accumulating for money advanced to pay interest. Had he not then understood that the expense of the additions and improvements should be paid only out of the earnings, he certainly would then have protested.

In the postscript to the letter of January 1, 1873, Mr. Moran says the lease should express in clear language that the lessee should not have power to sell the road through any advances made for construction account. In his letter of January 6, 1873, to Mr. Scott, Mr. Moran, being satisfied that the road could not be sold to pay for money advanced for interest, makes no objection to the provision as to money advanced for additions and improvements.

In the letter written to Mr. Churchill, on December 29, 1872, Mr. Moran says that Mr. Jewett and Mr. Scott call his attention to the fact that increased earnings require additional side tracks, equipment, etc., and that the lessee cannot be expected to incur them if they are to be at his sole risk, so long as the earnings are inadequate to defray them. While the letter of Mr. Jewett to Mr. Moran, of December 25, 1872, is not very clear, yet it would seem to indicate that Mr. Jewett contemplated that the expense of the additions and improvements was to be paid out of the earnings.

The Pan Handle Co. entered into the contract of the lease with the Muskingum Valley Co. knowing that it was insolvent. Under the lease the Pan Handle Co. took possession of all the property to be operated by it and to pay the surplus over to the Muskingum Valley Co. The Pan Handle Co. knew that the Muskingum Valley Co. had no means with which to make the additions and improvements or with which to pay for the same save as there might be a surplus of earnings produced by its

operation of the road. Therefore the Pan Handle Co. could not have anticipated that the Muskingum Valley Co. would either make the additions and improvements, or would pay for them, save as it could do so out of surplus earnings, and the lease must have been executed with the understanding on the part of the Pan Handle Co., as well as on the part of Mr. Moran, that the additions and improvements were to be made by it and paid for out of the earnings of the road. And as the Muskingum Valley Co. had nothing with which to pay except the surplus earnings, settlement as between the lessor and lessee should be made out of them. The Pan Handle Co. made the additions and the improvements, and at no time made demand on the Muskingum Valley Co. for payment.

This is the contract the Pan Handle Co. made with full knowledge of all the circumstances. It did or should have, anticipated all the results. I do not think the failure on the part of the Muskingum Valley Co. to make payment, or the failure of the Pan Handle Co. to produce a surplus out of which payment could be made, are subesquent events which would render the enforcement of the contract unreasonably harsh or oppressive.

Tiedeman on Real Property (2 Ed.) sec. 194, lays down the proposition: "Nor is the lessor's performance of his covenant to repair a condition precedent to the tenant's liability on his covenant for rent."

This is supported by the case of Newman v. French, 45 Hun 65, and under this authority it would appear that the covenants are independent.

The defendants claim that the net earnings of the Muskingum Valley Co. in the operation of its road up to May 1, 1872, were insufficient by a large amount to pay the interest on its bonds; that said company was insolvent in 1872 and 1873, and up to and through 1875; that in 1872 and 1873 the Pan Handle Co. was doing a prosperous business and had, after paying all operating expenses, a large surplus of net yearly earnings; that prior to 1873 the bonds of the Muskingum Valley Co. were of little value because of the insolvency of the company and its inability to pay interest; that the negotiations for the lease were entered into in 1872, and it was not then contemplated that the Pan Handle Co. should advance any means to pay interest on the bonds of the Muskingum Valley Co.; that through the years 1872 and 1873 the president of said Muskingum Valley Co. was a director and general counsel of the Pan Handle Co., and also general counsel of the Pennsylvania Co.; that the Pennsylvania Railroad Co. and the Pennsylvania Co., who owned a large majority of the stock of both said Pan Handle Co. and the Muskingum Valley Co., had, as owners of $752,000.00 of the bonds of the Muskingum Valley Co., large pecuniary interests directly adverse to the interest of the minority stockholders of the Pan Handle Co., and by means of their control of the latter company caused said alleged agreement of lease to be executed by its officers; that the provisions of said lease were directly adverse and greatly prejudicial to the interest of the minority stockholders of the Pan Handle Co., and were in law a fraud upon their rights and void.

It is clear that the Pennsylvania Railroad Co. and the Pennsylvania Co., through its ownership of a majority of the stock of the Pan Handle Co., controlled in the election of directors of said company, and the evidence shows that at the meetings of the stockholders of the Pan Handle Co. at which the subject of the lease was under consideration, said com, panies voted their stock in favor of the lease. It is also clear that the Pennsylvania Co., through its ownership of a majority of the stock of the Muskingum Valley Co., controlled in the election of directors of that company, and the evidence shows that, at the meeting of the stockholders of that company, the Pennsylvania Co. voted its stock in favor of the lease.

I take it to be the law that the stockholders of a corporation, so long

as they act within the law and in good faith, may vote their stock for such persons as directors and for such measures as to them may seem best; and that, in doing so, they are not bound to observe the wishes or interests of other stockholders.    (L. R., 9 Eq. 354.)

The fact that the Pennsylvania Railroad Co. owned the majority of the stock of the Pennsylvania Co., and that these two companies owned the majority of the stock of the Pan Handle Co. and of the Muskingum Valley Co., would not preclude them from voting their stock; but it must appear that they acted in good faith towards the minority stockholders. (Cook on Stock and Stockholders, 3 Ed., sec. 662.)    It certainly appears that the Pan Handle Co. and the Pennsylvania Railroad Co. and the Pennsylvania Co. acted in unison to effect the lease; but such action was the result of the control of the Pennsylvania Railroad Co. over the other companies by the ownership of stock.    But the mere fact that it owned the majority of stock does not raise a legal inference of undue influence.    (120 U. S. 670.)

The Pan Handle Co. acted in the matter by its directors duly elected by the stockholders, and their action was approved by the vote of 135,800 shares for, to 1275 shares against the lease, at the meeting of December 30, 1872; and by the vote of 135,841 shares for, and none against the lease, at the meeting of March 18, 1873—the total stock of the company being 168,671 shares.    The large majority by which the lease was ratified by the Pan Handle Co. shows that the stockholders of that company were practically unanimous in ratifying the lease as being for the best interests of the company.    (54 N. Y. Sup. Ct. 179.)

The Pennsylvania Railroad Co. held a majority of the bonds of the Muskingum Valley Co., which were bearing 7 per cent. interest.    It was clearly to its advantage to have the interest paid; but at the same time the Pennsylvania Railroad Co. held over two-thirds of the stock of the Pan Handle Co., and payment of the interest by the Pan Handle Co. was to the detriment of the Pennsylvania Railroad Co.    I think a mathematical calculation shows that its loss on its stock by the payment of interest was greater than its gain by receiving interest on its bonds.    The loss to the minority stockholders by the payment of interest was greater in proportion than the loss of the Pennsylvania Railroad Co., as it was not off-set by the receipt of money as interest.    While the interests of the majority stockholders and of the minority stockholders were different in degree, yet they were not antagonistic.    The payment of interest on the bonds was detrimental to both.

Under these circumstances, could it be said to be a fraud on the part of the Pennsylvania Railroad Co. to vote for the lease?

If there was fraud on the part of the majority to the prejudice of the minority stockholders, he may have his remedy.    "A court of equity will intervene and protect the minority upon an application by the latter." (Cook on Stock and Stockholders, 3 Ed., sec. 662; L. R., 9 Eq. 35.)    Provided they are not barred by laches.    Peabody et al. v. Flint et al., 88 Mass. 52, 57.)    But I cannot appreciate upon what principle the Pan Handle Co. can, in this case, set up that by a vote of the majority of its stockholders it entered into an agreement to the prejudice of the minority stockholders, and asked to be relieved from the covenants of its agreement, otherwise valid.    If we can recognize in this case the majority stockholders and the minority stockholders, then we must recognize that it is the same majority stockholders who caused the execution of the lease, who are to-day claiming that by doing so they perpetrated a fraud upon the minority stockholders, and that by reason of having perpetrated such fraud they should be relieved of their agreement.    Even if the lessee corporation

could be heard to set up the right of its minority stockholders, I think that under the circumstances of the case it would be barred by laches. (145 U. S. 408.)

The minority stockholder is not here complaining. He brought his suit in Jefferson county, setting up all matters now set up by the company, but he dismissed his case and went out fo court.

Three of the directors of the Muskingum Valley Co. were also directors of the Pan Handle Co. But it would seem that in the action of directors the court will not interfere . on the ground that a minority of the board of directors of one company were also directors of the other company, between which two companies a transaction is had (34 Ohio St. 450) unless they are guilty of fraud or a breach of trust. (37 Ohio St. 556.)

The record shows no fraud on the part of the directors of the Pan Handle Co. or Muskingum Valley Co.

It is further claimed upon the part of the defendants that the alleged agreement of lease was not legally executed on the part of the Pan Handle Co., in that it was not ratified by the vote of the stockholders of said company at a meeting legally called for said purposes.

It apears, too, that at the meeting of the directors of the Pan Handle Co., held on March 17, 1873, a resolution was passed that the lease as modified be submitted to the stockholders of said company at their annual meeting, to be held on March 18, 1873; that at the annual meeting of the stockholders of said company, held at said time, the said lease was approved, ratified, etc.

It is provided by the act passed March 19, 1869, (66 Ohio L. 32), in force at the time of the execution of the lease, that:

"Any railroad company organized in pursuance of law, either within this or any other state, may lease or purchase any part or all of any railroad, the whole or a part of which is in this state, and constructed, owned or leased by any other company, if said company's lines of said road are continuous or connected at a point either within or without this state, upon such terms and conditions as may be agreed on between said companies respectively;" provided that no such lease shall be "perfected until a meeting of the stockholders of said company of this state, party to such agreement, whereby a railroad in this state may be   *   *   *   leased   *   *   *   shall have been called by the directors thereof at such time and place and in such manner as they shall designate, and the holders of at least two-thirds of the stock of such company represented at such meeting in person or by proxy and voting thereat, shall have assented thereto;" etc.

It would seem that the provisions of the statutes were complied with on the part of the Pan Handle Co., unless it be that the matter of the lease was submitted to the stockholders at the next annual meeting, in place of being submitted to them at "a meeting of the stockholders of said company,   *   *   *   called by the directors thereof at such time and place and in such manner as they shall designate."

It will be noticed that the statute makes no provision for notice of such meeting being given for any length of time. While the directors did not call a meeting, they ordered that the matter be submitted to the stockholders at a meeting, the time and place of which was fixed and known by all the stockholders.

Of the 168,671 shares of the capital stock of said company, 135,841 shares were voted, all for said lease, at the meeting of March 18, 1873. No protest was entered, and no objection was made by any stockholder. Under the resolution passed at this meeting, the lease was executed, the lessee went into possession, remaining in possession and complying with the terms of the lease until 1885, when Samuel Jeans brought his suit

in Jefferson county, based upon his protest against said lease, entered at the meeting of the stockholders of the company held December 30, 1872, and dismised the same in 1892.

Even if the point were well taken, it seems to me it is too late now for the Pan Handle Co. to raise it. (88 Mass. 57.)

And it is further contended that the power given by the legislature to one railroad company to lease the road of another company does not include the power of the lessor to make any guaranty of the obligations of the other, that such guaranty is entirely foreign to the provisions of such a lease as the legislature contemplated should be made, and that such guaranty is not obligatory on the lessor; that there is no sufficient consideration for such guaranty.

But as the legislature has given the right to a railroad company to lease the road of another, it certainly, by implication, gave the right to stipulate for the payment of a rental. In this case no specific rental is contracted for, the lessee does not guarantee the payment of the interest, but it stipulates that it will advance the needful means to pay the coupons at maturity, to be refunded out of the subsequent earnings. If by its operation of the road earnings were produced, to that extent the amounts so advanced would be returned; if no earnings were produced, a return would not be made. The contingency of earnings was one of the chances taken by the lessor. The amount stipulated to be paid was seven per cent. on the bonds which had been issued for the purpose of building the road—the cost of the road—with a chance of a return of the same or a portion of the same. This would not be an excessive rental.

But further, the payment of the interest on the bonds was a condition precedent to the continuation of the lease, as all the parties well knew; if the interest was not paid, the mortgage would be foreclosed. Surely the lessee could contract to do that which would make the lease possible.

The defendant sets up the proceedings in the suit brought by Samuel Jeans et al., in Jefferson county; that on or about January 1, 1886, the Pan Handle Co. turned over and surrendered all of said railroad and property of said Muskingum Valley Co. to the latter company; that the said Muskingum Valley Co. accepted such surrender and resumed the control and possession of said railroad and property; that since said time the companies have regarded and treated said alleged lease as surrendered and terminated, and said Muskingum Valley Co. had possession and control of said road and property, and operated the same ever since.

And the defendant sets up the proceedings of the directors and stockholders of the respective companies at the meeting of the directors of the Muskingum Valley Co., held January 4, 1893; at the annual meeting of the stockholders of the Muskingum Valley Co., held March 28, 1893; at a meeting of the directors of the P. C. C. & St. L. Ry. Co., held on January 5, 1893; at the annual meeting of the stockholders of the P. C. C. & St. L. Ry. Co., held on April 11, 1893, and claims that the said lease was cancelled and terminated, and the railroad and property were surrendered by the lessee to the lessor and accepted by the lessor.

It appears from the evidence that the action of the Pan Handle Co. in turning the property over to the officers of the Muskingum Valley Co. on or about January 1, 1886, was taken after the appeal form the decree in the Jeans case was perfected, and I suppose it could therefore hardly be claimed that the act of the company was taken under said decree. (Henry v. Jeans, 48 Ohio St. 443, 458.)

But it seems to me clear that by the dismissal of the Jeans case all proceedings in that case drop out of consideration in determining the

rights of the parties. The question remains whether, by the acts of the parties, the lease was cancelled and terminated.

On April 15, 1873, and after the execution of the lease, an act was passed (70 Ohio L. 129) amending the act of March 19, 1869, supra. This act provides that no such lease shall be "perfected until a meeting of the stockholders of each of said companies shall have been called for that purpose by the directors thereof on thirty days' notice to each stockholder, at such time and place and in such manner as is provided for the annual meetings of said companies, and the holders of at least two-thirds of the stock of each company, in person or by proxy, shall have at such meeting assented thereto," etc.

Judge Jackson held in the Moran case, that "the lessor and lessee could themselves have vacated and terminated said lease by mutual agreement at any time."

Judge Van Brunt held, in 11 Daly, 373, 377, that under chap. 218 of the Laws of 1839 (N. Y.) given below, the directors, with the assent of the stockholders, could modify the lease; and the Court of Appeals of New York, in the Beveridge case, 112 N. Y. 1, held, under the same act, that the directors could modify the lease.

It seems to me, therefore, that powers to cancel the lease existed in the corporation. The difficult proposition to determine, however, is, in what mode may the lease be cancelled?

It is claimed on the part of the defendant that while the power of one corporation to lease the road of another corporation is not one of the ordinary owers of the corporation, and does not exist except as given by special enactment, yet that a lease, having been executed by two corporations under such special enactment, the power to cancel the same is one of the ordinary powers of the corporation, and may therefore be exercised by the directors. The proposition is that the primary and main design of authorizing the formation of a railroad company is to construct, maintain and operate a railroad (sec. 3270 Rev. Stat.), not to construct roads to lease to other companies, or to lease roads from other companies to be operated. A railroad company cannot, therefore, lease its road, unless expressly authorized to do so by the legislature; but when the power to lease is granted, such power, being a "corporate power," is to be exercised by the directors under sec. 3248, Rev. Stat. If, however, the assent of the stockholders is required by the statutory provisions, a lease made by the directors does not become operative until such assent is given. And it is urged that the reason of the rule that a corporation may not lease its road without legislative authority, is that the franchise is granted to the company to be exercised for the public good, the due performance of its franchises being the consideration of the public grant. And that any contract undertaken without consent of the state to relieve such company of the burden imposed by the charter, is a violation of the contract with the state, and is void as against public policy, citing 101 U. S 71; that the power to make a lease, therefore, does not exist unless expressly conferred, because it is a departure from the objects intended to be accomplished by the grant of the franchises; but the vacation and termination of a lease simply restores the parties to their original legal and actual state established by the charter No new powers are thereby created The power to vacate and terminate a lease is therefore one of the "corporate powers" which under sec. 3248 must be exercised by the directors.

I think it is well settled by 101 U. S. 71 118 U. S. 290; Ib. 630. 145 U. S. 393, that unless specially authorized by its charter or aided by some other legislative action, a railroad company cannot, by lease or other contract, turn over to another company for a long period of time, its road and

all its appurtenances, the use of its franchises, and the exercise of its powers. Such contract is not among the ordinary powers of a railroad company, and is not to be inferred from the usual grant of powers in a railorad charter.

The reason of this proposition seems to be not only as stated by the defendant, but also as stated in 11 Peters, 421, "Public grants are to be construed strictly."

But it seems to me to follow from this proposition that the power to cancel a lease can not exist in a corporation until the power to execute a lease is given to it. It can not be an ordinary, corporate power conferred by the charter. The corporation can not have power to loosen that which it has no power to bind.

While it is held that in grants by the public nothing passes by implication (11 Peters, 421, 546), yet the rule applicable to all statutes, "that what is fairly implied is as much granted as what is expressed," applies to statutes granting powers to corporations (101 U. S. 82), and it seems to me that the power to cancel may be fairly implied from the power to execute.

By the statute, no provision being made with reference to the mode in which a lease executed under it may be cancelled, it would seem the intention of the legislature was to allow its mode of cancellation to be governed by the general rule established by the law with respect to the cancellation of contracts generally.

The rule of law is laid down in Broome's Legal Maxims, p. 877: "Nothing is so consonant to natural equity as that every contract should be dissolved by the same means which rendered it binding." * * * "An obligation is not made void but by a release; for "naturale est quidlibet dissolvi eo modo quo ligatur." A record by a record, a deed by a deed, and a parol promise or agreement is dissolved by parol, and an act of parliament by an act of parliament. This reason and this rule of law are always of force in the common law." Ib.

If, therefore, the agreement to lease is not perfected until ratified by the stockholders under the statute, an agreement to cancel the lease would not be prefected until ratified by the stockholders under the statute.

It would seem this rule of law is applicable, not only because it is a rule of law, but because its application is necessary to carry out the intention of the legislature in making provision for the execution of a lease.

The lease of a road necessarily affects the interests of the stockholders of the lessor and lessee companies.

Judge Gholson says, in 1 Disney, 92: "The legislature has, in some cases, in respect to some matters, authorized action on the part of stockholders, and directed their assent to be obtained. Such provisions will be found in the general railroad law, and they are on points vitally affecting the interests of the stockholders."

It was clearly the intention of the legislature that the interests of the stockholders should be protected, not only through their directors, but also by the power given them to ratify or reject a proposed lease; the act of April 15, 1873, even providing that any stockholder who shall refuse to assent to the proposed lease, shall be entitled to receive from the lessee the average market value of his stock.

It certainly could not be rightfully claimed under these statutes that after the lease had been executed containing the provision for the advancement of money to pay interest on the bonds, which was inserted at the instance of Mr. Moran and for the purpose of getting the stockholders represented by him to consent to the lease, that the directors of the companies could modify the contract by a rescission of the stipulation. The

purpose of the law could not be evaded in this manner. If this be true then could the lease be modified as to its term by the directors? Could they change the term from ninety-nine years to, say, ten or fifteen years, without the consent of the stockholders? The stockholders represented by Moran consented to the lease for a term of ninety-nine years, and with a stipulation contained in it as to the advancement of money for the payment of interest during the term of lease, or so long as the bonds are outstanding, not for a term of ten or fifteen years, and not that the money should be advanced for ten or fifteen years; I do not see upon what principle the rights of the stockholders of the lessee company in the leased porperty, or the rights of the stockholders of the lessor company in the stipulations of the lease, can be modified in any particular or can be cancelled, without their assent. The cancellation of the lease is in effect its modification by changing its term form ninety-nine years to a shorter term.

"If the board of directors could not make a new lease upon definite terms and conditions, then clearly they could not radically modify the old lease. If they could not make a new lease directly, then they could not in effect make a new lease by striking out of the old lease substantial covenants upon the part of the lessee and inserting others. What would be unlawful if done directly, cannot be legal because done indirectly."

Judge Van Brunt, in Metropolitan R. R. Co. v. Manhattan Elevated R. R. Co., 11 Daly, 373, 471.

This decision was followed in Harkness v. Manhattan Ry. Co., 54 N. Y. S. C. 174, 179. The Court of Appeals, in Beveredge v. N. Y. E. Co., infra., holds that the directors may modify a lease because they may make the lease. This does not controvert the above proposition of Judge Van Brunt.

It seems to me to necessarily follow that by the execution of the lease under the terms of the statute, an estate vested in the lessee which cannot be divested either by modification of cancellation, without the consent of its stockholders, under the terms of the statute, and which can not be reinvested in the lessor without the like consent of its stockholders.

The defendant cites Beveredge v. N. Y. E. R. R. Co., 112 N. Y. 1, in support of the claim that the agreement may be modified without the concurrence of stockholders. In that case the court held that under the act of the legislature of 1829 (Chap. 218, Laws of 1839), a lease by one railroad corporation to another of its road and franchises may be made by the board of directors of the lessor, and the concurrence of the stockholders is not essenital to its validity; and the court held further that the concurrence of stockholders was not essential to the validity of a subsequent agreement reducing the rent.

Chapter 218 of the Laws of 1839 of N. Y. is as follows: "It shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed in such contract. But nothing in this act contained shall authorize the road of any railroad corporation to be used by any other railroad corporation in a manner inconsistent with the provisions of the charter of the corporation whose railroad is to be used under such contract."

The court, in the Beveredge case, in discussing the question of the necessity of the authorization of stockholders to give validity to the lease, say, on page 22, 23: "If such a contract or a lease by a railroad corporation to another of its railway, was not within the powers expressly conferred by General Laws, by which, or by the charter, the corporate powers are measured, it would be ultra vires and could not be made at all. But

as the act of 1839 authorizes the making of such contract, and the law does not regulate the manner of making it, or impose restrictions with respect to it, I think it must logically follow that the power to make it is, like all other general powers of management, lodged in the directors."

In this case the court was construing a statute which gave to the directors the power to execute a lease, and held that they could modify the lease. This is clearly the law, under the rule of law laid down in Broom, supra. But I do not think the case is applicable under the provisions of the law of our state further than it exemplifies the rule laid down in Broom.

The defendant also cites 15 Ohio St. 328; 34 Ohio St. 450; 37 Ohio St. 556; 7 Fed. Rep. 793; 1 Disney, 92, to the effect that after the election of the directors of a corporation all the business of the corporation is to be transacted by them or under their authority. But this power of the directors is, by all these cases, made subject to any restrictions which may be placed, by special enactment, on the same. The power to cancel a lease was not a power given by the charter, but grew out of the statute conferring power on the corporation to execute a lease. Its exercise by the directors should therefore be subject to such restrictions as will carry out the object of the legislature. At the meeting of the stockholders of the Muskingum Valley Co. of March 28, 189, a majority, but less than two-thirds of the holders of stock of the company represented at the meeting and voting, assented to the action of the directors in declaring the lease cancelled. Consequently less than two-thirds of the holders of stock of the company assented to such action. Therefore, whether we consider the act of March 19, 1869, or the act of Aptril 15, 187, a requisite number of stockholders did not assent to the cancellation of the lease.

If it be true that a cancellation of a lease requires the assent of the stockholders under the statute, then any action taken by the lessee and the lessor companies through their directors, without such assent, would be of no moment. The act of the Pan Handle Co., on January 1, 1886, in turning the road and property over to the officers of the Muskingum Valley Co., and the possession taken by the same by said officers, would not affect the rights and obligations of the parties under the lease. The title of the road and property under the lease would remain in the Pan Handle Co., and the rights of the Muskingum Valley Co. under the lease would remain unaffected. The action of the stockholders of the Muskingum Valley Co., at the meeting of March 2, 1886, March 22, 1887, and March 27, 1888, in approving the reports of the directors is of no avail, as it does not appear by what vote the reports were approved.

The claim made by the defendant under Pomeroy's Eq. Juris., sec. 1407; 15 Mich. 381; 46 N. H. 464; 130 Ill. 44 118 Pa. St. 610, that the Muskingum Valley Co. has not complied with the terms of the contract on its part to be performed, and can not comply with them, and that therefore it has no standing in equity, can not be sustained, if I am right in my construction of the terms of the lease.

Under the lease it placed the road and all of its property in the possession of the lessee, and complied with all the terms of the lease on its part to be performed. The road and property remained in possession of the lessee without any question for twelve years, when the lessee, of its own motion, attempted to divest itself of the same. The attempt on the part of the officers of the Muskingum Valley Co. to resume possession of the road and property in 1886 was without any authority whatever on the part of the company, and the attempt of the company in 1893 to cancel the lease was without authority of law, and the act of the officers in 1886 and the attempted action of the company in 1893 were clearly at the in-

stance of the Pan Handle Co., and procured by its power over the Muskingum Valley Co. through the Pennsylvania R. R. Co.

The plaintiff prays that the validity, obligation and binding force of the said lease, as against the P. C. C. & St. L. Ry. Co. may be established by the court.

I think this part of the prayer should be granted.

The plaintiff further prays that said company may be repossessed of the said demised premises and compelled during the residue of the said term of lease to maintain and operate the demised premises at its own proper cost, expense and risk, and so as to save the Muskingum Valley Co. and its stockholders harmless therefrom.

Under 13 Ohio St .544, the court will decree the specific performance of a contract to operate a railroad only "in a case where the demand for the exercise of such a power was stringent," etc.

If the validity of the lease is established, and the obligations of its covenants are maintained as enforceable against the lessee or its successor, it seems to me that, so long as the road is operated in the manner called for by the lease, it is immaterial to the plaintiff whether it is operated in the name of the lessee or in the name of its successor, or in the name of some other company.

Further, the reasons given by Judge Gholson on p. 555, 557 of 13 Ohio St., for refusing to decree the specific performance of a contract to operate a railroad, would appear to apply to the case at bar, and they are so cogent that the court would not seem to be justified in granting this part of the prayer of the petition.

The plaintiff further prays for a judgment against the P. C. C. & St. L. Ry. Co. for the amount of the coupons in default, with interest, to be collected and distributed among the holders of the bonds and coupons. I think this part of the prayer should be granted.

The plaintiff further prays a judgment for the interest from date of maturity to date of payment on coupons maturing on and after July 1, 1885, and which were paid after respective dates of maturity.

It seems to me that the holders of the coupons in accepting payment of the same after maturity and in surrendering the coupons without any stipulation as to interest indicated their intention to accept the face of the claim in full settlement, and the court should not interfere. Therefore this part of the prayer should not be granted.

The plaintiff further prays that the P. C. C. & St. L. Ry. Co. may be compelled hereafter to advance to the Muskingum Valley Co. from time to time as the same may mature, all moneys necessary for the payment of said coupons. I think the rights of the Muskingum Valley Co. in this matter should be enforced through supplemental pleadings.

A judgment may therefore be taken finding that the attempted surrender of the road and property was without authority of law, and decreeing that the same be set aside and held for naught. And finding that the parties, in attempting to cancel the lease, had failed to comply with the law, and decreeing that the lease is, and at all time has been, a valid and subsisting lease, as against the Pittsburgh, Cincinnati & St. Louis Railway Company and its successor, The Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company, and adjudging that the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company pay the amount of the coupons which matured prior to the filing of the petition herein, and are in default, with interest, to the proper parties, holders of said bonds and coupons, who may appear to be entitled thereto, by proof to be taken before a commissioner, to be appointed by this court; with leave to the plaintiff, by supplemental petition to set up claims on subsequently maturing coupons.

George Hoadly, and Harmon, Colston, Goldsmith & Hoadly, counsel for plaintiff.

Ramsey, Maxwell & Ramsey, and Harrison, Olds and Henderson, *contra.*

July 20, 1895.